The FOLEY COMPANY, Plaintiff,

v.

WALNUT ASSOCIATES, a limited partnership, et al., Defendants,

New York Life Insurance Company, Jerome M. Rubenstein, and Chicago Title Insurance Company, Defendants-Appellants,

J. H. Mackay Electric Company, Inc., Defendant-Respondent.

No. KCD 30541.

Missouri Court of Appeals, Western District.

April 7, 1980.

Donald W. Giffin, Gardiner B. Davis, Kansas City (Spencer, Fane, Britt & Browne, Kansas City, of counsel), for defendants-appellants.

Samuel J. Molby, Randall C. Werntz, Kansas City (Watson, Ess, Marshall & Enggas, Kansas City, of counsel), for defendant-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

DIXON, Judge.

The appeal in the instant case is from a judgment of the trial court, sitting in equity, which: found that J. H. Mackay Electric Company, Inc. was entitled to payment from the owner for construction work upon the Mercantile Bank Building, declared the amount due to be secured by a mechanic's lien, and imposed prejudgment interest upon a portion of the judgment.

The issues are the validity of the lien, the propriety of the prejudgment interest, the construction of the contract as it relates to the amount due, and a claim of offset or recoupment based upon the lien claimant's alleged delay in performance.

The trial court made specific findings of fact and conclusions of law, albeit in a somewhat unusual but effective fashion. At the conclusion of the evidence, the court indicated it would like an oral statement by counsel for the lien claimant as to each requested finding. As each such finding was stated, the court permitted a response and then announced the court's ruling upon the requested finding or conclusion. Despite this informality, these recorded findings and conclusions pinpoint the essential issues on this appeal.

This appeal involves only New York Life Insurance, as the present owner of the Mercantile Bank Building, and Chicago Title Insurance Company, as the title insurer of the building. These parties are the appellants and will, for convenience, be referred to as New York Life. The lien claimant, J. H. Mackay Electric Company, Inc., was a cross claimant in the original litigation and is the sole respondent on this appeal.

Walnut Associates, a Missouri limited partnership, was the developer and equitable owner of the Mercantile Bank Building. The legal title during construction was in an entity called Bok, Inc., a Maryland corporation. Concordia Project Management, Limited, was an agent for Walnut Associates, and the contract in question was between Concordia, as such agent, and Mackay. Concordia's function appears to be a cross between an owner's agent and a general contractor: soliciting bids, negotiating contracts, supervising performance, and generally expediting the work. There is no question that Mackay was a general contractor having an original contract with the owner, Walnut Associates.

There is no dispute in this case as to the timely filing of the lien and suit to enforce the lien or the sufficiency of the legal description. The dispute centers initially on the amount of the lien which turns on the contract issues and the validity of the lien because of the inclusion of nonlienable items.

Mackay's contract was to perform certain electrical work and to install electrical fixtures and materials in the building. This contract, executed on July 20, 1973, called for a lump-sum payment to Mackay in the amount of $460,355.00. In its lien statement filed March 14, 1975, Mackay claimed a further sum of $79,118.79 for additions to the contract, which, after deducting for payments received in the amount of $498,-358.59, left a net claim of $41,115.20.

Subsequent to the filing of the lien statement, on April 9, 1975, Mackay issued a credit memo in the amount of $1,437.00, reflecting a charge that had been included in the lien statement for certain lighting fixtures called for by the contract that had not been installed. As a result of this credit, the claim was reduced to $39,678.20, the amount demanded in the Mackay cross claim filed September 4, 1975.

The trial court entered a judgment for Mackay in the amount of $37,618.11. The parties say this was arrived at by adding $10,300.48 of the $12,360.57 claimed for "labor escalation" in its mechanic's lien statement to what they refer to as an "undisputed" sum of $25,257.54 found by the trial court. These two figures add to $35,558.02 which is $2,060.09 less than the judgment entered. No one on this appeal even notes, much less complains of this miscalculation.

Based upon the exhibits, the fact appears to be that the undisputed amount of the Mackay claim was $27,317.63 which, when added to the $12,360.57 claimed for labor escalation, amounts to the final lien claim of $39,678.20.

The first issue raised is the validity of the labor escalation charges. Mackay submitted invoices reflecting the increase in direct labor costs and fringe benefits on all labor on the project after April 1, 1974.

These increased costs resulted from labor contracts binding Mackay and entered into in September, 1973, and September, 1974. The original bid had assumed some increase from September, 1973, to April 1974, the initially scheduled completion date. To the calculation of labor charges, out of pocket, Mackay added 20% for overhead and profit. The trial court found against Mackay on the 20% for overhead and profit, and it no longer figures in the contract dispute. The trial court, however, found for Mackay on the basic charge for labor escalation.

The hinge of the dispute as to the remainder of the labor escalation charges, the $10,300.48 figure, is a single contract provision. The construction contract agreed upon by the parties provided: "Labor escalation after April 1, 1974 to be negotiated." New York Life contends the contract provision is a clear and unambiguous "agreement to agree." Mackay claims the provision is ambiguous and, when properly construed, means that labor prices after April, 1974, were to be based upon the negotiated contract wage rates in effect on that date. There is no dispute that Mackay's labor costs were determined upon an annual industrywide labor negotiation between an association of electrical contractors and the labor unions. The trial court found the contract was ambiguous and construed it as contended by Mackay. The court explicitly based this finding upon its consideration of two precontract documents—the Instructions to Bidders and the Mackay bid—which were received in evidence over objections and which provided: "Prices are to be good to April 1, 1974, with percent labor escalation thereafter."

This poses the initial issue on the appeal: Was Mackay entitled to the labor escalation charges in the amount of $10,300.48 as the trial court found? It is the position of New York Life that the contract has but one meaning, that the parties "agreed to agree," and that such an agreement is unenforceable. From this premise, New York Life argues that the trial court was in error in receiving the two precontract documents, the instructions to bidders and the bid of

Mackay. New York Life asserts that these are *parol* evidence offered to vary the terms of "a *clear and* unambiguous contract clause."

There can be no dispute as to the principle announced by the cases cited by New York Life that the parol evidence rule prohibits the introduction of parol evidence to alter or vary the terms of a contract. But before the rule can be applied, the contract must be interpreted to determine its meaning. Without doubt, the court is entitled to consider more than the express language of the agreement when making this original determination. Much of the dispute in this case centers upon the issue of ambiguity or lack of ambiguity in the disputed language. The trial court found the language to be ambiguous. While it might be very questionable that the language here considered is ambiguous as presenting two equally reasonable meanings, from the language itself or by the application of the language to the object of the contract, the review by this court is not limited to the theory advanced by the trial court that such ambiguity exists. In the review of a court-tried case, the judgment will be affirmed if correct on any proper theory.

The central question, thus, is the appropriate meaning to be ascribed to the contract. This process of interpretation or construction in the first instance rests upon a consideration of the language used by the parties in a written agreement. When the meaning is so apparent from the four corners of the writing that no question of meaning arises, the task is completed.

> "However, the proper discharge of the judicial function in a case in which the parties to an agreement disagree as to its meaning and effect ordinarily requires something further than a mere examination and consideration of words employed in the written contract." *Cure v. City of Jefferson*, 380 S.W.2d 305, 310 (Mo.1964).

*Cure* equates that judicial function to the standards of interpretation of the Restatement of the Law of Contracts § 230, and, in construing a construction contract, which was integrated, adopted the following language from the Restatement of the Law of Contracts:

> " '*The standard of interpretation of an integration*, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, *is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by parties of what they intended it to mean.*'

. . . . . .

[Section 235 contains these rules in aid of application of Section 230]:

'(c) A *writing is interpreted as a whole* and all writings forming part of the same transaction are interpreted together.

'(d) *All circumstances accompanying the transaction may be taken into consideration, subject in case of integrations to the qualifications stated in Section 230.*

'(e) If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation.'

Comment on Clause (d) of the foregoing includes the following (*Id.* Section 235): . . .

'The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation *even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement.*' "
(Emphasis added).

Restatement 2d of the Law of Contracts reiterates these principles in Sections 228,

229, and 238. Section 229 speaks directly to the issue presented in the instant case. Section 229 is entitled, "Standards of Preference in Interpretation." Subsection (a) of Section 229 reads:

"(a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;"

This is identical with Section 236(a) Restatement of Contracts. The Comment in Restatement 2d, in referring to the quoted standard of interpretation, states:

"b. *Superfluous terms.* Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous. The parties may of course agree to supersede prior manifestations of intention; indeed, this is the normal effect of an integrated agreement. See § 239. But, particularly in cases of integrated agreements, terms are rarely agreed to without reason. Where an integrated agreement has been negotiated with care and in detail and has been expertly drafted for the particular transaction, an interpretation is very strongly negated if it would render some provisions superfluous."

When the language of the instant agreement is considered, in the light of these principles, and interpreted, the issue is resolved. Applying the principle that an interpretation is negated which renders a provision of the agreement superfluous, and looking to the language for an effective meaning in the light of the circumstances and the language utilized, a different meaning or interpretation is found.

In the instant case, the term, "labor escalation," may in itself refer to a change in labor costs by reason of external forces. It is true, as New York Life contends, that the words of a contract are to be given the plain and ordinary meaning they import, *Liberty Storage Co. v. Kansas City Terminal Warehouse Co.,* 340 S.W.2d 189, 192 (Mo.App.1960) and *National Corporation v. Allan,* 280 S.W.2d 428, 433 (Mo.App.1955), unless they are technical or trade terms, in which case, they are to be given the meaning accorded to them in the trade or business. In fact, the General Conditions of this contract 1.2.3. adopt the latter rule as a part of the contract which, in effect, restates Missouri law. *National Corporation, supra.* "Labor escalation" is such a word of art; as the evidence in the instant case disclosed, it refers generally to the increase in labor costs occasioned by renegotiation of industry wide labor rates beyond the immediate control of the parties. Escalation clauses in modern contract law are generally understood to refer to increases caused by external forces beyond the control of the parties. The language "to be negotiated" also poses problems of exact meaning in the context of the instant contract. Mackay correctly asserts that here the parties who will negotiate are not specifically identified. Moreover, the contract date was July, 1973, the labor escalation was to be effective after April, 1974. The language, "to be negotiated," could be in reference, as Mackay claims, to negotiations between those two dates, the results of which could not have been known to the parties at the time the agreement was signed.

Applying, then, the Restatement principle of construing or interpreting the agreement as a whole including the prior writings of the parties, the meaning emerges with unmistakeable clarity. The instructions to bidders and the bid itself which state, "Prices are to be good to April 1, 1974 with percent labor escalation thereafter," coupled with the circumstance known to the parties that labor negotiations would take place in September escalating labor costs beyond that date, make the contract term understandable and rational.

Mackay was required by the invitation to give a firm price until April, 1974, which, of course, required an educated guess on its part as to the result of the September negotiations with the union. It appears that the guess *was* well educated since, on a contract of over half a million dollars, the claim for wage escalation boils down to a little over $10,000.

Thereafter, the contract provides for an increase in labor costs based upon the certainty of labor costs then known. The owner was contemplating completion by that date and would ordinarily have subjected itself to no risk. When so interpreted, the contract is fair and reasonable to both. Mackay was warned to, and did, anticipate the labor increase to the projected completion date. The owner agreed that the risk of increased labor cost after the projected completion date would rest with the owner.

New York Life, in its brief, relies heavily on *Monia v. Oberle*, 530 S.W.2d 452 (Mo.App.1975). There, the contract language was, "Additional agreement to be made concerning sharing balance of approximately seventy acres of land." The court on appeal reversed the trial court's finding of ambiguity on the ground that the language, "additional agreement to be made," negated any present contractual meaning. The distinction which removes the strength of this case as support for New York Life's position is that the evidence offered to give a meaning to the contract clause different than appeared on the face of the agreement was oral evidence. Oral evidence of the *meaning* of a contract is expressly excluded from the standard of interpretation set forth in the Restatement Section 230 and the oral evidence in the instant case has not been considered in the interpretation of the contract. So interpreted, the contract meaning supports the trial court judgment that Mackay was entitled to the additional labor cost after April, 1974.

The next issue to be dealt with is the claim by New York Life that the inclusion of nonlienable claims in Mackay's lien statement vitiates the lien. In view of the ruling with respect to the labor escalation issue, the only items left for consideration on this claim are the "20% profit and overhead" added to the labor escalation, amounting to a total of $2,060.09, and the deletion, after the lien was filed, of a $1,437.00 item for courtyard light fixtures admittedly not installed by Mackay.

The parties are agreed that the law with respect to this issue is stated in *Sears, Roebuck & Co. v. Seven Palms Motor Inn, Inc.*, 530 S.W.2d 695 (Mo. banc 1975). *Seven Palms*, at 698–99, states the rule as follows:

"It is generally recognized that a lien statement may be regarded as 'just and true,' so as not to vitiate the entire lien, if the inclusion of a nonlienable item is the result of honest mistake or inadvertence without intent to defraud *and if the nonlienable can be separated from the lienable items*." (Emphasis added).

The trial court found specifically that these items were either inadvertently or in good faith included in the lien statement.

Considering first the issue of the light fixtures, the factual background is supportive of the trial court's finding that this item was inadvertently included. Substantial work on the project continued until November of 1974. The architect issued the certificate of substantial completion on November 21, 1974, but that certificate indicates that some items were left unfinished. The list is not in evidence, but presumably, any inspection by the architect prior to preparing the certificate and list would have disclosed the absence of the light fixtures.

In November, 1974, it was beyond doubt that the project was in financial difficulty. Mackay was owed at that point about $90,000. Work continued sporadically until March 13, 1975, and, on March 14, Mackay filed its lien statement. The lien statement is extremely detailed and quite bulky. The statement contains a summary of the contract price, the payments, the extras, and the balance due. Each of these summary items is cross referenced to an exhibit which contains the original invoice supportive of the amounts stated. For instance, on the payments made under both the contract and the extra work, each payment is supported by an architect's certificate of work performed, to which are attached the detailed invoices showing the work performed which, in each case, is cross referenced to the specifications and the plans as to contract items.

Concordia, as agent for the then owner, Walnut Associates, was ostensibly in a position to determine from those records what

had been accomplished and what remained to be done. Mackay, understandably concerned that the lien period might run, filed its lien in March. On April 9th, Mackay issued a credit for the light fixtures. The only testimony on this issue came from a Mackay representative who said the cancellation of the light fixture installation and the request for a credit came only a short time prior to the credit. The credit memo itself reflects that the request not to install the lights originated with the owner. There is no proof that the request for the credit or the direction to cancel the fixtures occurred prior to the filing of the lien.

■ The record concerning this contract, showing as it does extra work of about $79,000 in scores of work orders and a final job cost of over $500,000, demonstrates a considerable confusion and lack of precision in the management of the project. Many of the extra work orders were for repairs of damaged installations and temporary electrical work. The finding of the trial court that the fixtures were included by inadvertence is supported amply by the record in this case. There is no evidence that Mackay was fraudulently or by overreaching attempting to make lienable this minor item of $1,437 in the filing of its complex and detailed lien statement. If Concordia was performing its function properly, it should have been able to easily separate this item from the balance of the work.

On the question of the addition of the 20% for overhead and profit, it was clearly identified as a separate item on the invoices submitted to Concordia. Both it and the fixture item were known to Concordia and New York Life, as the successor to Walnut Associates. They cannot claim that the knowledge of Walnut Associates is not known to them. The trial court found against Mackay on the basic issue of the right to claim the 20% under a provision of the contract permitting such a charge on extra work. The position of Mackay on the assertion of this claim is not so unreasonable as to demonstrate bad faith in including the charge. Again, the minor amount

contrasted with the overall contract sum is significant. The trial court's finding of good faith on this issue is not clearly erroneous and is amply supported by the evidence. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

On the issue of the prejudgment interest, the trial court stated that as a matter of equity the court would allow prejudgment interest on the amount which the trial court found was indisputably due under the contract. New York Life did not even offer token resistance on the factual issue that Mackay was entitled to the amount due under the contract, excluding the extra charge for labor and the minor amount for light fixtures. As noted, the trial court miscalculated this amount to the detriment of Mackay, but Mackay has not complained.

■ The position of New York Life on the issue of prejudgment interest is that the amount of Mackay's claim was disputed and that, therefore, Mackay's claim is unliquidated and not subject to imposition of prejudgment interest. Cited is *Protection Mutual Insurance Co. v. Kansas City*, 551 S.W.2d 909 (Mo.App.1977), for the general rule that "interest cannot be allowed as part of the damages if the basic damages are unliquidated in nature." *Id.* at 916. New York Life asserts the rationale for the rule is that:

"Denial of [prejudgment interest] . . . is based, generally, on the idea that where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." *Fohn v. Title Insurance Corp. of St. Louis*, 529 S.W.2d 1, 5 (Mo. banc 1975).

Neither the rule not the rationale for the rule applies to the facts of the instant case. *Protection Mutual, supra*, is inapplicable on its facts to the instant case, for the issue there was the construction of § 537.140 RSMo[1] as providing for interest and because the claim was for damages, a truly unliquidated claim. In the instant case, § 429.210 RSMo 1978 expressly authorizes prejudgment interest. The instant case is

---

1. RSMo 1969, since repealed.

factually analogous to *Herbert and Brooner Construction Company v. Golden*, 499 S.W.2d 541 (Mo.App.1973), and that case controls the award of interest in the instant case. The dispute as to liability does not make the amount an unliquidated amount. *Ehrle v. Bank Building and Equipment Corp. of America*, 530 S.W.2d 482, 497 (Mo. App.1975). If New York Life's position on this issue were sound, then any property owner could dispute liability or amount and avoid the imposition of the interest provided by § 429.210 RSMo 1978.

The final issue to be determined is the claim of New York Life that it was entitled to a setoff or recoupment as to the Mackay claim on account of a delay in performance by Mackay occasioned by a failure of the supplier of essential equipment to honor delivery schedules. It is stipulated that this delay was occasioned by a strike of the workmen in the supplier's plant. The trial court found that Mackay had not breached its contract. It is not entirely clear from the record who was responsible for the scheduling of these deliveries. It is clear the Concordia was involved in that scheduling. In any event, Concordia attempted to bill Mackay for claimed damages for delay, and Mackay rejected the claim asserting they were not responsible under the contract. Article 8 of the standard general conditions of the contract deals with questions of timely performance. Sec. 3.1 of those standard provisions, in pertinent part, reads as follows:

> "If the Contractor is delayed at any time in the progress of the Work . ., or by labor disputes, . . ., or any causes beyond the Contractor's control, . . ., then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine."

This provision clearly exonerates the contractor from delays beyond its control, including labor disputes. The fact that the architect, who had to be aware of the delay and the reason for it, did not, so far as the record shows, formally issue a change order cannot affect Mackay's rights under the agreement.

Moreover, there were admissions by Walnut Associates that Mackay had fully and properly performed its contract and, in fact, a judgment was entered in favor of Mackay against Walnut Associates which comprehended the defense now asserted. That judgment estops New York Life to assert the defense now tendered. *Oates v. Safeco Ins. Co. of America*, 583 S.W.2d 713 (Mo. banc 1979). In fact, *Safeco* would apply to all the issues raised herein had the parties raised the issue and briefed the case upon that basis.

The judgment is affirmed.

All concur.