698 F.2d 1351
 ST. JOSEPH LIGHT & POWER COMPANY, Appellant,
v.
ZURICH INSURANCE COMPANY, et al., Appellees.
ZURICH INSURANCE COMPANY, Appellant and Third-Party Plaintiff,
v.
BLACK & VEATCH, Appellee and Third-Party Defendant.
ST. JOSEPH LIGHT & POWER COMPANY, Appellee,
v.
CONTINENTAL INSURANCE COMPANY, et al., Appellants.
ST. JOSEPH LIGHT & POWER COMPANY, Appellant,
v.
ZURICH INSURANCE COMPANY, Appellee.
 Nos. 81-2430, 81-2431, 81-2432 and 82-1034.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 11, 1982.
Decided Jan. 24, 1983.
 
 Lawrence L. McMullen, James M. Warden, Allan V. Hallquist, Kansas City, Mo., for third-party defendant-appellee Black & Veatch Consulting Engineers; Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., of counsel.
 Richard J. Phelan, William T. Cahill, Terry M. Weyna, Chicago, Ill., James H. Ottman, Kansas City, Mo., for third-party plaintiff-appellant Zurich Insurance Co.; Phelan, Pope & John, Ltd., Chicago, Ill., Shook, Hardy & Bacon, Kansas City, Mo., of counsel.
 Robert A. Downing, Stephen C. Carlson, Dennis R. Hansen, Chicago, Ill., for plaintiff-appellant St. Joseph Light & Power Co.; Sidley & Austin, Chicago, Ill., of counsel.
 Before BRIGHT and ARNOLD, Circuit Judges, and MEREDITH,* Senior District Judge.
 BRIGHT, Circuit Judge.
 
 
 1
 This appeal arises out of a dispute between a public utility, St. Joseph's Light & Power Co. (SJLP), and several insurance companies over liability for damage to one of SJLP's boilers at its power plant in St. Joseph, Missouri. All but one of the parties appeal or cross-appeal from the judgment of the district court. For the reasons outlined below, we affirm in part and reverse in part.
 
 
 2
 I. Background.
 
 
 3
 On April 26, 1975, SJLP's Boiler No. 6 at its Lake Road power plant in St. Joseph, Missouri, caught fire and suffered serious damage. As a result, the boiler was inoperative until June 7, 1976, and repair costs totalled $4,623,744.49. In addition, SJLP spent $544,309 during the outage to purchase electricity from Associated Electric Cooperative, in order to have sufficient capacity to meet the needs of its customers.
 
 
 4
 SJLP carried two types of insurance policies applicable to the boiler. Zurich Insurance Co. (Zurich) provided a policy covering the boiler and other machinery. Zurich's insurance contract provided that Zurich compensate SJLP for the amount SJLP actually expended to repair or replace any property damaged in an accident covered by the policy. Zurich's policy only covered damages resulting from low-water conditions in SJLP's boilers. In a letter to SJLP dated May 12, 1975, Zurich denied coverage for the loss, contending that the damage to the boiler resulted solely from fire.
 
 
 5
 SJLP also held fire insurance purchased from sixteen insurance companies[1] (Fire Carriers). These insurance contracts covered SJLP for the cost to repair or replace property lost, damaged, or destroyed by fire. Following the damage to the boiler, the Fire Carriers paid SJLP $1,400,000 to be applied against the portion of the loss, if any, attributable to fire. They denied liability, however, contending that a low-water overheating condition, and not fire, caused the damage. The Fire Carriers made no other payments to SJLP and reserved the right to recoup their $1,400,000 if SJLP was unable to establish that fire caused the damage.
 
 
 6
 Prior to the events of April 26, 1975, SJLP purchased "extra operating expense" insurance from Great American Insurance Co. (Great American).[2] This insurance policy covered any necessary extra expenses SJLP might incur in conducting its business during an outage caused by fire, including the cost of purchasing electricity from other sources. Great American denied liability on the ground that a low-water overheating condition, and not fire, caused the outage.
 
 
 7
 Confronted by these denials of coverage, SJLP sought a declaratory judgment and other relief in federal district court. SJLP requested that the district court determine whether the boiler damage resulted from a low-water overheating condition, a fire, or both, and, if from both, to determine the amount of loss attributable to each. Zurich, in turn, filed a third-party complaint in subrogation against Black & Veatch, the engineering firm that designed and installed the boiler. Zurich's third-party complaint alleged that if the jury found Zurich liable for any portion of the damage to the boiler, then Zurich would be subrogated to the rights of SJLP against Black & Veatch on a claim of professional negligence in design and installation of the boiler. The district court's jurisdiction was based upon diversity of citizenship between SJLP and all the defendant insurance companies. Rule 14 of the Federal Rules of Civil Procedure authorized the third-party complaint.
 
 
 8
 At trial, the Fire Carriers contended that a low-water overheating condition caused the loss, while Zurich argued the loss resulted from fire. At the close of SJLP's case against the insurance companies, the trial court directed a verdict in favor of Black & Veatch on Zurich's third-party complaint. The court held that Zurich could not recover in a negligence action against Black & Veatch because SJLP, to whose rights Zurich was subrogated, had been contributorily negligent as a matter of law. Later, at the close of all the evidence, the trial court directed a verdict in favor of SJLP on the issue of coinsurance, holding that the Fire Carriers did not establish a right to contribution to the fire loss from SJLP under the coinsurance clauses contained in the fire policies.
 
 
 9
 The jury returned a verdict against the Fire Carriers in the amount of $2,507,180.40, against Zurich in the amount of $2,116,564.09 (for a total of $4,623,744.49 for damage to SJLP's Boiler No. 6), and against Great American in the amount of $544,309 (for extra operating expenses during boiler's outage). The trial court deducted certain amounts which, by agreement, were not submitted to the jury in order to avoid possible confusion, and entered final judgment in the amount of $2,483,593.44 against the Fire Carriers, $2,095,151.05 against Zurich, and $494,309 against Great American.
 
 
 10
 Following the district court's entry of final judgment, SJLP moved to amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) to include prejudgment interest, as authorized by Missouri law, in the amount of $683,857.28 against Zurich and $353,684.88 against the Fire Carriers. Mo.Ann.Stat. Sec. 408.020 (Vernon Supp.1982). Great American and the Fire Carriers both moved for judgment notwithstanding the verdict or, in the alternative, a new trial. Zurich, as third-party plaintiff, moved for a new trial against third-party defendant Black & Veatch. In its posttrial order, the district court denied SJLP's request for prejudgment interest on the ground that the amount of damages for which the Fire Carriers and Zurich were individually responsible was not readily ascertainable prior to the verdict. In addition, the district court: (1) granted Great American's motion for judgment n.o.v. on the question of liability for extra expense on the ground that the extra expense policy applied only to a loss totally caused by fire, which the jury had not so determined; (2) denied the Fire Carriers' motion for a judgment n.o.v. or a new trial, finding little merit to the reasons the Fire Carriers offered in support of their motion; and (3) denied Zurich's motion for a new trial against Black & Veatch, holding that SJLP's contributory negligence barred Zurich's third-party action.
 
 
 11
 SJLP appeals from the trial court's denial of prejudgment interest, and from the grant of Great American's motion for judgment n.o.v. on the extra expense issue. The Fire Carriers appeal from the trial court's denial of a reduction in SJLP's recovery under the coinsurance provisions. Finally, Zurich appeals the district court's grant of a directed verdict in favor of Black & Veatch.
 
 
 12
 For the reasons outlined below, we reverse the district court's denial of prejudgment interest and affirm the court's entry of judgment n.o.v. for Great American on the issue of extra expense. In addition, we affirm the district court's grant of a directed verdict in favor of SJLP on the issue of coinsurance. Finally, we reverse the district court's grant of a directed verdict in favor of third-party defendant Black & Veatch and order a new trial on the third-party claim.
 
 
 13
 II. Discussion.
 
 
 14
 A. Prejudgment Interest.
 
 
 15
 SJLP argues that the district court erred in denying prejudgment interest under Mo.Ann.Stat. Sec. 408.020 in the amounts of $683,857.28 against Zurich and $353,684.88 against the Fire Carriers. At the time of SJLP's loss, section 408.020 provided in pertinent part:
 
 
 16
 Creditors shall be allowed to receive interest at the rate of six percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made[.][3]
 
 
 17
 The Supreme Court of Missouri has held that section 408.020 requires that prejudgment interest may be awarded whenever the amount due is liquidated, or, although not strictly liquidated, is readily ascertainable by reference to recognized standards. Denton Construction Co. v. Missouri State Highway Commission, 454 S.W.2d 44, 59-60 (Mo.1970). See also Laughlin v. Boatmen's National Bank of St. Louis, 354 Mo. 467, 189 S.W.2d 974, 979 (1945); Herbert & Brooner Construction Co. v. Golden, 499 S.W.2d 541, 553 (Mo.App.1973); and Cannon v. Bingman, 383 S.W.2d 169, 173 (Mo.App.1964). Missouri courts have held that this statute applies to insurance contracts. Schultz v. Queen Insurance Co., 399 S.W.2d 230, 235 (Mo.App.1965); Boenzle v. United States Fidelity & Guaranty Co., 258 S.W.2d 938, 943-44 (Mo.App.1953). Moreover, this court has stated that "the award of prejudgment interest in a case in which [s]ection 408.020 is applicable is not a matter of court discretion; it is compelled." Slay Warehousing Co. v. Reliance Insurance Co., 489 F.2d 214, 215 (8th Cir.1974); see also Blair International Ltd. v. LaBarge, Inc., 675 F.2d 954, 961 (8th Cir.1982).
 
 
 18
 The district court held that the sum owing to SJLP under its insurance contracts with Zurich and the Fire Carriers was neither liquidated nor readily ascertainable, and therefore denied SJLP prejudgment interest. Although the total amount due to SJLP had been known since July 1, 1976,[4] the district court observed that SJLP had failed to specify until the latter part of the trial the amounts due from Zurich, on the one hand, and the Fire Carriers on the other. The court concluded that while the total amount due SJLP was liquidated, the amounts for which each insurance company was liable were neither liquidated nor readily ascertainable until the jury returned its verdict.
 
 
 19
 On appeal, SJLP argues that its loss was readily ascertainable under the terms of the insurance policies by July 1, 1976, the date on which all repairs were completed and Boiler No. 6 was put back in operation. SJLP notes that the district court did not deny that the total cost of repairs to Boiler No. 6 was readily ascertainable by July 1, 1976. Instead, SJLP asserts, the district court denied prejudgment interest merely because the Fire Carriers and Zurich disputed liability. SJLP asserts that prejudgment interest should be awarded even when insurers dispute coverage so long as the total amount of damages is readily ascertainable.
 
 
 20
 Zurich and the Fire Carriers argue that they cannot be assessed prejudgment interest because they did not know the amount each of them should pay as a full settlement of SJLP's claims against them. Zurich, for example, argues that SJLP's continual changes in its theories regarding liability made its ultimate damage claim unliquidated.[5] Zurich argues that each time SJLP's theory of liability changed, it followed necessarily that Zurich's estimated share of the damages also changed.
 
 
 21
 The issue before us, therefore, is whether prejudgment interest ought to be awarded where there is a dispute between insurers as to coverage so long as the total amount of damages claimed by the plaintiff is either liquidated or readily ascertainable. We hold that, under these circumstances, an award of prejudgment interest is proper.
 
 
 22
 Under Missouri law, a defendant's denial of liability or challenge to the amount claimed on a contract will not alter the fact that the amount claimed by the plaintiff is sufficiently ascertainable to require the award of prejudgment interest. In Schmidt v. Morival Farms, 240 S.W.2d 952 (Mo.1951), the Missouri Supreme Court stated that "[i]nterest is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because he questions legal liability for all or portions of the claim." Id. at 961. In Schmidt, the manager of the defendant's farm demanded an accounting under an employment contract providing for twenty-five percent of the farm's net profits as part of his compensation. The court held that the manager was entitled to interest, even though the employer denied liability. In Foley Co. v. Walnut Associates, 597 S.W.2d 685 (Mo.App.1980), the Missouri Court of Appeals held that a "dispute as to liability does not make the amount an unliquidated amount." Id. at 692. The court reasoned that to hold otherwise would mean that "any property owner could dispute liability or amount and avoid the imposition of [interest] * * *." Id. See also Cohen v. Metropolitan Life Insurance Co., 444 S.W.2d 498, 500 (Mo.App.1969) (prejudgment interest awarded despite defendant insurance company's denial of liability and counterclaim for recision of the insurance contract).
 
 
 23
 It is also well settled under Missouri law that the fact that a defendant interposes counterclaims, setoffs, recoupment, or defenses does not alter the fact that the amount claimed by the plaintiff is "ascertainable," even though the amount of the defendant's counterclaim, setoff, or recoupment may not itself be reasonably ascertainable. In Ehrle v. Bank Building & Equipment Corporation of America, 530 S.W.2d 482 (Mo.App.1975), the Missouri Court of Appeals held that "[i]f a claim is liquidated, the interposition of a counterclaim, set-off, or defense does not convert the liquidated demand into an unliquidated one or preclude recovery for prejudgment interest even though the counterclaim, set-off, or defense places the amount payable in doubt." Id. at 497. In Herbert & Brooner Construction Co. v. Golden, supra, 499 S.W.2d at 553, the court of appeals held that a builder's action to enforce a mechanics lien presented a liquidated demand that should have been awarded prejudgment interest, notwithstanding the interposition of an unliquidated counterclaim. The Herbert court stated:
 
 
 24
 [W]here, as here, the plaintiff's demand is liquidated, the interposition of an unliquidated counterclaim, set-off or recoupment does not convert the liquidated demand into an unliquidated one or preclude the plaintiff's recovery of prejudgment interest[.] [Id. ]
 
 
 25
 Similarly, in Cannon v. Bingman, supra, 383 S.W.2d at 173, the Missouri Court of Appeals held that prejudgment interest should be awarded even though the defendant's claim for lost rental value in large part offset the plaintiff's claim. The court stated that "the right of one party to recover interest on a liquidated sum is not necessarily dependent upon the fact that all of the other parties' claims may be liquidated." Id. (footnote omitted) (emphasis in original). In Burger v. Wood, 446 S.W.2d 436, 444 (Mo.App.1969), the court held that where a plaintiff's demand is liquidated, interposition of an affirmative plea of recoupment does not convert a liquidated demand into an unliquidated one or preclude a plaintiff's recovery of prejudgment interest, even though the plea of recoupment puts the amount payable in doubt.
 
 
 26
 The logical extension of these cases is that when the total amount of damages claimed by the plaintiff is liquidated, prejudgment interest ought to be awarded even though the insurers dispute coverage. The insurers are doing nothing more than disputing liability, and this has never been a basis under Missouri law to deny prejudgment interest. As Professor McCormick succinctly put it, "it is the character of the claim and not of the defense that is determinative of the question whether an amount of money sued for is a 'liquidated sum.' " McCormick, Damages Sec. 54 at 216 (1935).
 
 
 27
 In denying prejudgment interest, the district court relied on Fohn v. Title Insurance Corporation of St. Louis, 529 S.W.2d 1 (Mo.1975). The key passage in Fohn relied on by the district court states that "[d]enial of [prejudgment interest] is based, generally, on the idea that where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." Id. at 5. We do not interpret this statement as creating a new rule in Missouri that when a defendant contests liability, or interposes a counterclaim, setoff, or defense, the claim against the defendant is unliquidated and prejudgment interest will not be awarded. A review of the facts of Fohn reveals that the plaintiff's claim was neither liquidated nor capable of being ascertained by references to any recognized standard, and it is on this basis that the Missouri Supreme Court denied prejudgment interest.[6]
 
 
 28
 A second reason why Fohn should not be construed as modifying the Missouri prejudgment interest rule is that to read the court's language as it stands in that opinion is to view that language out of its appropriate context. The Fohn court cites four cases as support for its statement of Missouri law on prejudgment interest. St. Louis Housing Authority v. Magafas, 324 S.W.2d 697, 700 (Mo.1959); Laughlin v. Boatmen's Nat. Bank of St. Louis, supra, 189 S.W.2d at 978; Herbert & Brooner Constructing Co. v. Golden, supra, 449 S.W.2d at 553; and Burger v. Wood, supra, 446 S.W.2d at 443. The Magafas court, in stating the Missouri rule, said:
 
 
 29
 [I]nterest is not usually allowed on unliquidated demands for the reason that the person liable does not know the amount he owes and hence cannot be in default because of his failure to pay. [324 S.W.2d at 700 (emphasis added).]
 
 
 30
 The Fohn court did not purport to overrule Magafas. Rather, the Fohn court cited Magafas for authority. Viewed in this context, it appears to us that the passage of the Fohn opinion relied upon by the district court is merely an incomplete statement of the Missouri rule as laid out in Magafas. The Fohn court simply omitted the emphasized clause in the Magafas opinion quoted above. The language in question from Fohn therefore cannot be said to stand for the proposition that prejudgment interest must be denied where the defendant does not know precisely how much he will eventually be required to pay the plaintiff because he contests liability or asserts counterclaims, setoffs, or defenses, even though the plaintiff's claim is ascertainable to a specific dollar amount. Accordingly, we conclude that prejudgment interest must be awarded on SJLP's claim even though Zurich and the Fire Carriers disputed liability under their respective policies.
 
 
 31
 B. Extra Operating Expense Policy.
 
 
 32
 Great American had issued SJLP an extra operating expense insurance policy. The policy covered any extra expenses incurred by SJLP to maintain its business during the period necessary to repair damage caused by fire. The policy did not cover extra expenses resulting from damage caused by a low-water condition. During the outage of Boiler No. 6, SJLP claimed to have incurred expenses of $544,309 in purchasing electricity from Associated Electric Cooperative to have sufficient capacity to meet the needs and demands of its customers.
 
 
 33
 The jury returned a verdict against Great American in the sum of $544,309 for extra operating expense during the period of the boiler's repair. After deducting amounts that were by agreement not submitted to the jury, the court entered a final judgment of $494,309 against Great American. The district court subsequently granted Great American's motion for judgment n.o.v. The district court stated in its order:
 
 
 34
 The prerequisite to recover under the extra expense policy is the occurrence of fire which directly resulted in the insured having incurred extra expenses to maintain its business during the periods necessary to repair the fire damage. The jury's duty was to allocate the extra expenses incurred as a result of the damages due solely to fire. However, the evidence presented at trial did not afford the jury any basis upon which to allocate what portion of the outage was caused by the low water condition and what portion was caused solely by fire. The jury's verdict against Great American was pure speculation and must be set aside.
 
 
 35
 SJLP advances four arguments contending that the district court erred in granting Great American's motion for judgment n.o.v. First, SJLP asserts that Great American, in its motion for directed verdict, did not raise the issue that there was no evidence to afford the jury a basis to allocate those extra expenses incurred by fire damage. SJLP therefore contends that the district court had no jurisdiction to grant a judgment n.o.v. on grounds not raised in the motion for directed verdict. See Johnson v. Rogers, 621 F.2d 300, 305 (8th Cir.1980) (a motion for judgment n.o.v. is technically only a renewal of motion for directed verdict made at close of evidence; a party cannot assert a ground not included in motion for directed verdict).
 
 
 36
 We reject SJLP's contention on this issue. Paragraph 3 of Great American's motion for a directed verdict set forth the issue of SJLP's failure to present evidence supporting an award against Great American. Paragraph 3 states:The evidence requires a finding that any fire damage which occurred did not in any way extend the period of time during which the boiler was down for repairs due to the damage caused by overheating.
 
 
 37
 Therefore, Great American argued in both its motions for judgment n.o.v. and directed verdict that SJLP had failed to present any evidence upon which the jury could base an award against Great American.
 
 
 38
 SJLP's second contention is that because the jury found that more than half the damage sustained by Boiler No. 6 had been caused by fire, all the extra expense incurred by SJLP can be deemed to have been caused by fire. SJLP's assertion that all of the boiler's downtime may be attributable to Great American simply does not follow from the proposition that fire produced approximately $2.5 million of damage to the boiler. The extra expense policy issued to SJLP by Great American provides in pertinent part:
 
 
 39
 1. This policy covers the necessary Extra Expense, as hereinafter defined, incurred by Insured in order to continue as nearly as practicable the normal operation of the Insured's business following damage to or destruction of real or personal property, by the peril(s) insured against * * *.
 
 
 40
 2. In the event of such damage or destruction, this Company shall be liable for such necessary Extra Expense incurred for only such length of time * * * as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged * * *.
 
 
 41
 Thus, where only a portion of the loss is attributable to fire, only downtime caused specifically by fire damage can constitute a basis for recovery under the policy. We simply do not know, on the basis of the record, how long it took to repair those components which were damaged by fire. Since a low-water condition, rather than a fire, caused some of the damage, SJLP had the burden, in order to support recovery, of establishing how much time was required to repair those portions of the boiler damaged by fire. The record is devoid of such proof. There is no evidence that repair of portions of the boiler damaged only by fire took one month or thirteen months. Our review of the record reveals that the only testimony that SJLP presented relating to the extra expense loss was that of Ralph B. Mayer, SJLP's vice president of operations, who stated that the total time necessary to repair all portions of the boiler lasted from April 26, 1975, through June 7, 1976. In addition, SJLP introduced exhibit 732b into evidence which simply set forth in summary fashion the extra expenses incurred on a month-to-month basis for the entire period of downtime. SJLP made no attempt to allocate the extra expense cost between that caused by fire and that caused by the low-water condition.
 
 
 42
 Third, SJLP contends that because the trial judge properly instructed the jury on the question of extra expenses, we must presume that the jury properly followed those instructions. This argument is entirely without merit. Where there is no evidence to support a jury's award of damages, that award must be overturned. Chicago, B. & Q.R. Co. v. Gelvin, 238 F. 14 (8th Cir.1917).
 
 
 43
 SJLP asserts, finally, that there is evidence in the record from which the jury could have found that fire was the precipitating event, and thus caused the entire outage. Accordingly, SJLP argues that the jury could properly award the full amount of $544,309. SJLP argues essentially that the jury found that the fire was the first or initiating event, and therefore all loss necessarily resulted from the fire. We reject SJLP's argument. The jury did not find that fire was the precipitating event. If the jury had so found, it would not have returned a verdict against Zurich. Jury Instruction No. 5 provided that the jury could not find Zurich liable for any loss which was the direct or indirect consequence of fire. The jury found Zurich liable for approximately $2.1 million of the loss. It could not, therefore, have determined that fire caused all of the damage, directly or indirectly. We note that SJLP has not challenged this verdict on appeal.
 
 
 44
 Accordingly, we hold that the trial court did not err in granting Great American's motion for judgment n.o.v.
 
 
 45
 C. Coinsurance.
 
 
 46
 The Fire Carriers' policies required that SJLP maintain insurance of ninety percent of the actual cash value of the insured property at the time of the risk. The clauses provide that in the event SJLP's coverage falls below ninety percent, SJLP must, as a coinsurer, bear that proportion of the loss to the extent of the deficit.
 
 
 47
 Initially, SJLP asserts that the Fire Carriers' appeal from the district court's denial of their motion for a judgment n.o.v. on the coinsurance issue should be dismissed for lack of jurisdiction. We do not agree. Although it is true that an order denying a judgment n.o.v. is generally nonappealable, it is well-settled that the technical requirements for a notice of appeal need not be "mechanically applied" where the lack of compliance does not "mislead or prejudice" the appellee. For example, in Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court treated a notice of appeal from denials of motions to vacate judgment and to amend the complaint as a notice of appeal from the original judgment in order to satisfy the then-existing requirements of Rule 73 of the Federal Rules of Civil Procedure. The Court found that the appellant had made manifest his intention to seek review and challenge both the dismissal of his earlier complaint as well as the denial of his motions, and that his "inept" attempt to appeal from the judgment did not prejudice the appellee. Id. at 181, 83 S.Ct. at 229. Moreover, the Court found that to deny the appeal on such a technical basis would thwart the purpose and spirit of the Federal Rules of Civil Procedure. Id. For the same reasons, we decline to avoid a decision on the merits "on the basis of such mere technicalities." Id. See also Bankers Trust Co. v. Mallis, 435 U.S. 381, 387, 98 S.Ct. 1117, 1121, 55 L.Ed.2d 357 (1978) (Second Circuit did not err in taking jurisdiction despite absence of required separate document setting forth district court judgment).
 
 
 48
 The Fire Carriers contended at trial that any amount recovered by SJLP against the Fire Carriers would have to be reduced in accordance with the ninety-percent coinsurance clause. The Fire Carriers argued that SJLP's coverage had fallen below the required ninety percent of the actual cash value of the property because, in submitting its estimated property values for the years 1972, 1973, and 1974, SJLP failed to upgrade its property values. Testimony at trial, therefore, focused on the manner in which SJLP had valued its property for the years in question.
 
 
 49
 At the close of all the evidence, SJLP orally moved for a directed verdict on the coinsurance issue. SJLP argued that the Fire Carriers had not complied with the Missouri statutory prerequisites to enforcing a coinsurance clause, and therefore could not raise coinsurance as a defense. The trial court granted SJLP's motion without further comment.
 
 
 50
 The Fire Carriers argue on appeal that they complied with the Missouri filing requirements for coinsurance, that they produced ample evidence of their compliance at trial, and that the coinsurance issue should have gone to the jury.[7] We disagree.
 
 
 51
 Missouri law imposes two requirements upon insurance companies before enforcing a coinsurance clause: (1) the insurer must give a reduction in premiums; and (2) the insurer must file its coinsurance "credits," or, rates, with the Missouri Superintendent of Insurance (Director).[8] Mo.Ann.Stat. Sec. 379.160 (Vernon 1968); Templeton v. Insurance Co. of North America of Pa., 201 S.W.2d 784, 789 (Mo.App.1947). If the insurer does not meet these two requirements, the coinsurance clause is void. Id. Under Missouri law, the coinsurance defense is an affirmative defense. The insurance company, "if it desires to bring itself within the provisions of the statute allowing coinsurance where it files its rates with the superintendent of insurance * * *, has the burden of establishing that it has so filed its rates." Newcomer v. Standard Fire Insurance Company, 165 F.Supp. 672, 677 (E.D.Mo.1958); see Foster v. Aetna Life Ins. Co., 352 Mo. 166, 176 S.W.2d 482, 485 (1943) (burden upon insurer to prove affirmative defense of release from liability); Turner v. National Benevolent Society, 224 Mo.App. 463, 28 S.W.2d 125, 126 (1939) (reliance by insurer on exception provided in policy is affirmative defense with burden on insurer).
 
 
 52
 The Fire Carriers filed their coinsurance rates with the Insurance Service Office of Missouri (ISO), a licensed independent rating organization of which the Fire Carriers are members. Relying on Mo.Ann.Stat. Sec. 379.321(1) (Vernon Supp.1981), the Fire Carriers argue that they demonstrated compliance with the statute by establishing that they filed their coinsurance rates with the ISO. Section 379.321(1) provides that an insurer may satisfy the requirements of filing with the Director by filing with a licensed rating organization.[9] The last sentence of section 379.321(1), however, states that in order to substitute effectively the rating organization for the Director as the proper recipient of the filings, the rating organization must, in turn, file those rates with the Director within ten days after its subscribers' rates become effective.[10]
 
 
 53
 The Fire Carriers produced no evidence at trial that the ISO is authorized by the Director to receive filings in the Director's stead. Indeed, the Fire Carriers did not mention section 379.321(1) at trial. Nor did they show that the ISO filed its rates with the Director within the requisite ten-day period under the statute. The Fire Carriers argue, rather, that filing with a rating organization is extremely common; that the ISO is a reputable organization; and that, presumably, the ISO always files subscribers' rates with the Director.
 
 
 54
 We have found no authority for the proposition that an insurance company is entitled to a presumption of compliance with the filing requirements of Mo.Ann.Stat. Sec. 379.160 merely by showing that the company filed its rates with an independent rating organization. It is immaterial that the Fire Carriers might easily have proved compliance with the statute. Equally irrelevant is the Fire Carriers' argument that SJLP did not contest the validity of the coinsurance clause until the evidence had all been presented. Neither argument relieves the Fire Carriers' burden of establishing that it filed its rates with the Director.
 
 
 55
 Accordingly, we hold that the district court properly dismissed the affirmative defense of coinsurance.
 
 
 56
 D. Third-Party Suit.
 
 
 57
 Zurich filed its third-party subrogation action against Black & Veatch shortly after SJLP brought suit against Zurich. Zurich alleged that Black & Veatch negligently designed and installed Boiler No. 6 and that any damage to the boiler resulted from Black & Veatch's negligence.[11]
 
 
 58
 After SJLP presented its evidence against Zurich and the Fire Carriers, Black & Veatch moved for a directed verdict on Zurich's third-party complaint. Although Zurich had not yet presented any evidence, the trial court granted the directed verdict. The trial court based its decision on the testimony of SJLP's officers and employees, holding that SJLP, by its own admission, had been, as a matter of law, contributorily negligent in operating the boiler. Accordingly, the court ruled that Zurich could not bring a third-party negligence action against Black & Veatch.
 
 
 59
 1. The Boiler.
 
 
 60
 Black & Veatch designed SJLP's electrical generating station located in St. Joseph, Missouri. Boiler No. 6 is part of that station. The boiler burns fuel to heat water into steam, which in turn rotates a turbine and generates electricity. The boiler is approximately ten stories tall.
 
 
 61
 Using a series of instruments, plant operators control the water level in the boiler drum and the "startup" process of the boiler. The startup is the period of time, generally several hours, needed to heat the water in the boiler to the point that it will generate enough steam to operate the turbine. During the startup, the water level fluctuates. The boiler operators may add or drain water to maintain a normal water level. The water level must not be allowed to drop too low, however, or the boiler may be damaged by overheating.
 
 
 62
 The operators use two general types of instruments to measure the water level in the boiler drum. The first is a "direct reading" Yarway "gage" glass and the second is an independent "remote" water level instrument. The boiler had three different remote water instruments: a Yarway normal level indicator, a Foxboro drum level indicator and recorder, and a Bacton drum level switch. In addition, the instruments are all connected to an "alarm" system of horns and lights designed to indicate an abnormal water level.
 
 
 63
 Before the direct reading Yarway gage glass and the three remote water level instruments will accurately represent the water level, the operators must follow certain preliminary procedures. Each of the three remote water level instruments has "sensing lines" that measure the water level responding to pressure created by the weight of water or steam in those sensing lines. In order for the remote instruments to give accurate readings, the sensing lines must be completely full of water. Preferably, the sensing lines should be filled before the start up process begins.
 
 
 64
 The direct reading Yarway gage glass is considered the most reliable of the water level instruments, and was usually the instrument to which SJLP afforded the most deference. The gage glass is a vertical pipe attached to the water drum. Through a system of prisms, lights, color strips and mirrors, the gage allows the operators to see the water level in the pipe, and, if it is functioning properly, the level in the pipe will be the same as that in the drum.
 
 
 65
 To check the accuracy of the gage glass, a process known as a "blowdown" is used before starting up the boiler. To conduct a blowdown, the operators seal off the water supply from the drum to the vertical pipe and drain the water from the pipe. If the gage glass is working properly, it will indicate that no water is in the drum.
 
 
 66
 Because the gage glass is more reliable than the remote instruments, the operators at SJLP generally conducted a blowdown before starting up the boiler. They did not, however, always fill the sensing lines in the remote instruments.
 
 
 67
 2. Contributory Negligence.
 
 
 68
 In ruling on Black & Veatch's motion for a directed verdict, the district court found that SJLP failed to follow any of the above cautionary procedures to ensure the instruments were accurate on the night the boiler was damaged. The court found, based on the testimony of the boiler operators called by SJLP, that the operators neither filled the sensing lines in the remote instruments nor conducted a blowdown of the gage glass prior to startup. Furthermore, the court found that throughout the startup procedure, SJLP's boiler operators ignored several signs that indicated something was wrong and that the startup process should have been halted. The court stated that had the operators heeded these warning signals and shut the boiler down earlier, very little damage would have resulted to the boiler.
 
 
 69
 The trial court concluded that it was not necessary for Zurich and the Fire Carriers to present any evidence against Black & Veatch because: (1) SJLP's operators' testimony rose to the level of a judicial admission of contributory negligence; (2) no reasonable person could rightfully disagree that SJLP was contributorily negligent; (3) Zurich's and the Fire Carriers' causes of action against Black & Veatch were identical to SJLP's; (4) SJLP could not controvert its witnesses' testimony; and (5) Zurich, because it stood in the shoes of SJLP, was bound by SJLP's testimony.
 
 
 70
 After reviewing the record, we determine that the trial court erred in failing to hear all the evidence on the issue of contributory negligence before granting a directed verdict. Rule 50(a) of the Federal Rules of Civil Procedure provides that a party may move for a directed verdict "at the close of the evidence offered by an opponent."[12] Under the district court's rationale, the relevant "opponent" after whose presentation of evidence the directed verdict could be granted was SJLP. The court reasoned that because Zurich "stood in the shoes" of SJLP as a subrogee to SJLP's rights, Zurich was bound by the "judicial admissions" which SJLP's testimony effectively created.
 
 
 71
 In the context of this case, however, Zurich and SJLP cannot fairly be characterized as the same "opponent." While Zurich may stand in the shoes of SJLP insofar as being bound by SJLP's testimony and being subject to any defenses available against SJLP, Zurich is not limited to SJLP's evidence in proving its case. Had Zurich been allowed to present its evidence, Zurich may have been able to explain or elaborate on the testimony of SJLP's operators. Zurich might have been able to convince a reasonable person that the operators were not contributorily negligent in shutting down the boiler two hours later than the trial court found prudent. The trial court held that SJLP's operators' testimony rose to the level of judicial admissions. SJLP, however, carried the burden of explaining or justifying the actions of its operators. SJLP's cause of action against Zurich and the Fire Carriers was based in contract. Thus, whether the testimony SJLP presented served to indicate contributory negligence on its part did not affect its claims against the Fire Carriers. Zurich's cause of action against Black & Veatch, on the other hand, rested on the tort theory of professional negligence. Zurich carried the burden of rebutting the evidence of contributory negligence already in the record in order to make a case submissible for the jury.
 
 
 72
 On appeal, Zurich contends that had it been allowed to put on its case it would have presented evidence that SJLP's operators were not contributorily negligent when starting up the boiler. Zurich states that it would have called as a witness Riley Woodson, an engineer for Black & Veatch who was in charge of designing the boiler and who was familiar with its operation. Zurich states that Woodson testified in his pretrial deposition that he believed SJLP's operators acted properly under the circumstances, and that there were a host of considerations the operators had to take into account in addition to the "warning signals" cited by the trial court. Woodson also stated that, under the circumstances, it is very difficult to speculate after the fact whether the instruments and information available to the operators unequivocally showed that the operators should shut down the boiler.
 
 
 73
 In addition to offering Woodson's testimony, Zurich argues that several boiler operators who were on duty during the startup were not called by SJLP to testify, and that one of these witnesses might have offered evidence showing the operators did not act carelessly. Zurich argues that one of these witnesses might have testified that: (1) someone did blowdown the gage glass before startup; (2) a blowdown is not the only way to ensure accuracy of the gage glass; and (3) on the night of the startup it was not clear the boiler was functioning abnormally or that the only proper action to take was to shut down the boiler.
 
 
 74
 Whether Zurich would have been able to survive a motion for directed verdict on this issue after presenting its evidence remains an open question. That issue cannot be resolved on the present record. Accordingly, without expressing any view as to the sufficiency of Zurich's case, we reverse the district court's dismissal of Zurich's third-party action and order a new trial on that issue.
 
 
 75
 III. Conclusion.
 
 
 76
 In sum, we reverse the district court's denial of prejudgment interest, and order that SJLP be awarded appropriate prejudgment interest. We affirm the district court's order of a judgment n.o.v. for Great American on the issue of extra expense. In addition, we affirm the court's order granting a directed verdict in favor of SJLP on the issue of coinsurance. Finally, we reverse the court's order granting a directed verdict in favor of Black & Veatch and order a new trial on Zurich's third-party claim against Black & Veatch.
 
 
 77
 We remand for further proceedings consistent with this opinion.
 
 
 
 *
 JAMES H. MEREDITH, United States Senior District Judge, Eastern District of Missouri, sitting by designation
 
 
 [1]
 These sixteen companies are Continental Insurance Co., Aetna Insurance Co., Bituminous Casualty Corp., Boston Old Colony Insurance Co., Federal Insurance Co., Fireman's Fund Insurance Co., Fireman's Insurance Co. of Newark, Granite State Insurance Co., Hanover Insurance Co., Hartford Fire Insurance Co., Home Insurance Co., Maryland Casualty Co., Phoenix Assurance Company of New York, Transamerica Insurance Co., United States Fidelity and Guaranty Co., and Great American Insurance Co
 
 
 [2]
 Great American is also one of the Fire Carriers. See note 1, supra
 
 
 [3]
 Section 408.020 was amended, effective October 1, 1979, increasing the interest rate to nine percent. Mo.Ann.Stat. Sec. 408.020 (Vernon Supp.1982). SJLP based its request for prejudgment interest of $353,684.88 from the Fire Carriers and $683,857.28 from Zurich upon a rate of six percent from July 1, 1976 (after the repairs were complete and the boiler back in operation) to October 1, 1979, and nine percent thereafter to March 16, 1981, and gave the Fire Carriers credit for their $1,400,000 advance payment
 
 
 [4]
 The amount represented actual costs incurred by SJLP as reflected in repair invoices. SJLP alleges that repairs to Boiler No. 6 were complete by July 1, 1976, and its total repair bill was known to be $4,623,744.49. The district court did not find as a matter of fact that the total cost incurred by SJLP had been known by the parties since July 1, 1976, but the Fire Carriers admit to this in their brief, and there does not appear to be any dispute regarding this issue on appeal
 
 
 [5]
 Zurich alleges that in 1975, shortly after the boiler was damaged, SJLP contended that its loss was entirely due to fire. Zurich asserts that when SJLP filed its complaint in 1976, SJLP alleged that its damages had two "independent and nearly simultaneous" causes, a fire and an accidental low water condition. Finally, Zurich argues, SJLP changed its theory of liability again at trial and contended that an accidental low water condition caused the boiler damage, followed hours later by a fire
 
 
 [6]
 In 1966, Fohn purchased a 24.76 acre tract of land for a proposed shopping center and homes. Fohn then purchased title insurance from the Title Insurance Corp. of St. Louis. During the process of clearing the land for development, a third party, Bridal Cave, asserted title to a .52 acre triangular portion of the tract. A lawsuit between Fohn and Bridal Cave resulted in a holding that Bridal Cave had superior title. Fohn, in reliance on his title insurance policy, turned around and sued the Title Insurance Corp. The trial court entered judgment for Fohn. In reviewing the case on appeal, the Missouri Supreme Court was confronted by the problem, for the first time, of what standard of damages should be applied in suits against title insurance companies for losses incurred by insureds because of the loss of a portion of the insured tract of land. Because this question was of first impression, not only was Fohn's claim for damages unliquidated, but the damages were not readily ascertainable according to a recognized standard. The title insurance company urged that Fohn should only be able to recover the value of the .52 acre portion of the tract that Fohn lost. Fohn asserted, on the other hand, that the proper measure of damages was the difference between the value of that part which remained after severance and loss of the .52 acre piece. The Missouri Supreme Court adopted the standard advanced by Fohn
 
 
 [7]
 The Fire Carriers also assert that SJLP admitted the validity of the coinsurance clause when SJLP stipulated that all of the fire policy's provisions were "in full force and effect" at the time of the loss. We do not agree. The stipulation relates only to the issues that were involved in the case at the time the parties made the stipulation. The Fire Carriers did not raise the defense of coinsurance until the eve of trial, when the court granted them leave to amend their answer. Upon raising the affirmative defense, the Fire Carriers then assumed the burden of proving compliance with the statute. The stipulation, therefore, cannot be said to apply to this new issue
 
 
 [8]
 Section 379.160(3) provides in part:
 [W]hen a coinsurance clause is attached to any policy a reduction in rate shall be given therefor, in accordance with coinsurance credits that are now or may hereafter be filed as a part of the public rating record in the office of superintendent of insurance in this state, by fire insurance companies, that have been or shall hereafter be approved by the superintendent of insurance * * *.
 
 
 [9]
 Section 379.321(1) provides in pertinent part:
 Any insurer may satisfy its obligation to make any such filings by becoming a member of, or a subscriber to, a licensed rating organization which makes such filings and by authorizing the director to accept such filings on its behalf, provided that nothing contained in section 379.017 and sections 379.316 to 379.361 shall be construed as requiring any insurer to become a member of or subscriber to any rating organization or as requiring any member or subscriber to authorize the director to accept such filings on its behalf. Filing with the director by such insurer or licensed rating organization within ten days after such manuals, rating plans or modifications thereof or policies or forms are effective shall be sufficient compliance with this section.
 
 
 [10]
 For the text of the statute, see footnote 9, supra
 
 
 [11]
 The Fire Carriers also brought a third-party claim against Black & Veatch but they have not appealed the district court's dismissal of their claim. Accordingly, the judgment against the Fire Carriers on this issue is final
 
 
 [12]
 Rule 50(a) provides:
 (a) Motion for Directed Verdict: When Made; Effect. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.