The NIKA CORPORATION, Plaintiff,

v.

CITY OF KANSAS CITY, MISSOURI, a municipal corporation, James Threatt and James Bowers, Defendants.

No. 80–0609–CV–W–0.

United States District Court,
W.D. Missouri, W.D.

Sept. 27, 1983.

On Motions to Amend Judgment
Feb. 24, 1984.

Brian Butler and Gary M. Young, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiff.

Dorothy Campbell, Galen Beaufort, Asst. City Attys., Kansas City, Mo., for defendants.

## MEMORANDUM OPINION
## AND JUDGMENT

ROSS T. ROBERTS, District Judge.

This is a diversity action in which The NIKA Corporation ("NIKA"), a Wisconsin citizen, seeks damages from the City of Kansas City, Missouri (the "City"), and two employees of the City, in connection with an alleged appropriation of certain documents and materials which NIKA claims are its exclusive property. The defendants contend that by virtue of a contract entered into between NIKA and the City on April 19, 1976, the City has had and still has a continuing right to retain and use those documents and materials.

Under its third amended complaint, NIKA advanced five separate theories of recovery: a violation of 42 U.S.C. § 1983; a "taking" of NIKA's property without just compensation in violation of the Fifth and Fourteenth Amendments; common law conversion; a willful damage or destruction of property in violation of § 537.330, R.S.Mo.1969 (as amended); and breach of contract. The first, second and fourth of

those claims were dismissed upon defendants' motion under Rule 12(b)(6).[1] The remaining two claims have now been tried to the Court, sitting without a jury.

From the parties' pretrial stipulations (Pretrial Order No. 2), it is clear that diversity jurisdiction exists, as well as personal jurisdiction over each of the parties. That being so, I turn forthwith to my findings of fact, conclusions of law and judgment in the matter, pursuant to Rules 52 and 58, Fed.R.Civ.P.

## I.

### BACKGROUND FACTS

My findings as to the facts which form the general background of this controversy follow below, set forth in narrative form. Other facts, relating particularly to matters affecting interpretation of the contract in question, are set forth in Section II. Facts related to damages are recited in Section IV.

NIKA is a service business, engaged in estimating costs and preparing specifications for repair or rehabilitation of housing, particularly with regard to public housing programs, although it also performs those services for insurance companies, lending institutions, contractors, developers and the like. At the time of trial it employed a staff of twelve persons, composed of specialists in fields related to building and rehabilitation such as architects and construction experts, as well as systems specialists and computer specialists.

Central to NIKA's work in the above respects is a system developed by NIKA,

known as the Naces III ("Nika Accelerated Cost Estimating System No. 3"). The Naces III system is, in brief, an integrated system consisting of three basic component parts: (a) the "work systems," comprised of various manuals describing the overall system and how to use it and its various parts, as well as a variety of forms and reports which have been specially developed for use with the system; (b) the "information" or data files, which contain a listing of all items which might be used in rehabilitating a home, the various actions which might be taken with regard to an item, the possible locations in the home where the action might be performed, the specifications for performing the work, and the costs for each such item and action; and (c), computer programs, which instruct a computer how to utilize a report on a home, how to access the data files, and how to produce a printout of specifications, including cost estimates, for rehabilitation of that home. Such a system is said to provide three advantages over "manual" cost estimating and specification systems: it is faster, provides uniform results, and prevents fraud or abuse. NIKA ordinarily contracts to provide the services of the Naces III system; it does not and never has "sold" the system to customers.[2]

Sometime prior to December, 1975, City officials began investigating a rehabilitation loan and grant program designed to benefit low to moderate income persons whose homes were located in certain deteriorating neighborhoods in Kansas City. In essence, the program was to involve low interest loans and grants, made from a fund administered by the City, the proceeds

---

1. See footnote 8., *infra.*

2. A brief example of the system in operation, as I understand it, may be helpful. An inspector, utilizing a set of report forms developed by NIKA (items in the "work systems" category), will make an inspection of a house which is to be rehabilitated. Those report forms are very comprehensive, and permit the inspector, simply by checking boxes, to specify what needs to be done, where it will be done, how it needs to be done, etc. The report forms are then key punched into a computer which, following the instructions of a computer program, accesses

the information files stored in the computer (which contain all the relevant information and data as to material, labor, time and cost factors) (the "information" component of the system), and produces a set of reports with respect to that particular project, showing among other things a cost summary, detailed specifications for the work, and a checklist. These latter report forms are also parts of the "work systems" items. This is, it should be noted, a rather simplified example, and does not do justice to the complexity of the "work systems" and "information" components of the system.

of which would be used to rehabilitate single family, owner occupied homes in designated rehabilitation districts. Ultimately, the program was approved by a resolution of the City Council adopted December 25, 1975. Defendant James Threatt, an Assistant City Manager responsible for community development, was in charge of the program (or at least the portion thereof in which NIKA was to become involved).

In connection with that rehabilitation loan program, City officials decided to seek proposals for a computerized housing rehabilitation specification system. To that end, on December 4, 1975, Threatt initiated a "Request for Proposal" letter, inviting proposals for such a system from outside companies and concerns. Among other things, the letter suggested that the anticipated workload was expected to be 500 dwelling units during the first year, "with up to 2,200 over three years." The letter also indicated that the City was interested "in a lease arrangement for the system with an option to purchase."

On December 18, 1975, NIKA's Board Chairman, Edward Gray, sent to the City NIKA's proposal for the work outlined in Threatt's December 4th Request For Proposals. Thereafter, in a letter dated February 3, 1976, Threatt advised Gray that NIKA had been selected to provide the City with a computer specification program, contingent upon the negotiation of a contract in connection therewith. Gray responded, on February 25, by sending Threatt a draft of a proposed contract. This contract was delivered to defendant James Bowers, an Assistant City Attorney, for his review as to form. Bowers recast the same in a format more commonly used by the City, but made no substantive changes of any relevance here except to add "Part II," mentioned in more detail hereafter.

Between the end of February, 1976 and mid-April, 1976, Gray and various City officials discussed a number of items connected with the proposed contract. In particular, during March, Gray met in Kansas City with several City officials, including Threatt and Bowers, to work out contract language. The Bowers' contract revision provided the starting point for that meeting. Ultimately an accommodation was reached between the parties and a formal written contract was executed on April 19, 1976, providing that NIKA was to furnish its Naces III system, together with certain services, to the City over a one-year period. That contract contained the following section, upon which much of the dispute in this case centers:

"V. It is agreed that the various work systems, computer programs and information necessary for the operation of the system and programs are the exclusive property of the NIKA Corporation, except that the City rewrite of the Naces III Program shall, upon completion satisfactory to the parties, become the joint property of the parties. However, the City may not sell, give, license or distribute the program to any other governmental agency, corporation, firm or person. Further, if the City desires to use the program for any activity other than the project described herein, the City will notify NIKA of said use in writing."

Performance under the contract was commenced immediately and work proceeded apace, with only normal difficulties being encountered. The contract expired by its own terms on August 31, 1977, with NIKA having performed all of its obligations satisfactorily and the City having made all its required payments in timely fashion.

Upon completion of the contract, however, the City did not return to NIKA the work systems documentation and information files which had been involved in its use of the Naces III system. On September 26, 1977, after conversations on that subject with other City employees, Gray sent a letter to Threatt, making reference therein to Section V of the contract and requesting that the City either compensate NIKA for its continued use of those items or return the items to NIKA and cease any further use. Threatt referred the letter to Bowers

for advice. Bowers assured Threatt that the City had, under the contract, purchased the entire system, and that there was no responsibility to return anything to NIKA. Armed with that opinion, Threatt decided simply not to respond to the letter.

Having received no reply to his letter of September 26, Gray corresponded again with Threatt on October 30, 1977, renewing his demand on behalf of NIKA. At Threatt's direction, Bowers responded to the letter, refusing the demand with the statement that Section V of the contract did not require that the City return anything to NIKA.

The final two meetings between Gray and the City took place in January, 1978. At the first of those meetings, Gray and his attorney met with various City officials and once again requested return of the work systems and information files. That conference was unproductive. At a meeting with Threatt a few days later, Gray again requested return of the items in question. Threatt replied, in substance, that the City had the items and if Gray wanted them he could sue.

Following August 31, 1977, the City continued to use and revise the work systems materials and informational files originally supplied and revised by NIKA. At some undefined point after August 31, 1977, the City also permitted the Rehabilitation Loan Corporation (a not-for-profit corporation organized after August 31, 1977, for the purpose of carrying on the rehabilitation loan program initially commenced by the City) to use those same materials and files for its purposes in maintaining a housing rehabilitation specification system.

## II.

### CONTRACT INTERPRETATION

[1] The first question before me involves the parties' conflicting claims over the proper meaning of Section V of the contract. More specifically, the question is whether by the use of the word "Program" in the phrase, "the City rewrite of the Naces III Program," it was intended that the City acquire (as it claims) a continuing property right in the whole of the Naces III system and all of its component parts; or instead (as NIKA claims), was to acquire such a right only in the rewritten computer programs component thereof. Since this is a contract involving a Missouri party, negotiated at least in part in Missouri and performed largely if not entirely in Missouri, and since the contract lacks any choice of law provision, Missouri law will be applied. See *Havenfield Corporation v. H & R Block, Inc.*, 509 F.2d 1263, 1267 (8th Cir. 1975).

The Missouri courts have adopted, in general, the position taken by the *Restatement (1st) of Contracts* with respect to contract interpretation and the parole evidence rule. See, e.g., *Foley Co. v. Walnut Associates*, 597 S.W.2d 685, 688 (Mo.App.1978). Under that view, a court's first task in the present sort of situation is to *interpret* the disputed contractual provision. *Foley Co. v. Walnut Associates, supra.* In performing that task the court should focus, initially, both upon the language of the provision in question and upon the agreement as a whole. *Id.* If, in that process, the meaning of the disputed language becomes "so apparent . . . that no question of meaning arises [or remains], the task is completed." [3] *Id.* However, the proper discharge of a court's interpretative function in a case of disputed meaning will ordinarily require something more than a mere examination of the words employed in the contract, and in those circumstances the court may quite properly consider a variety of matters outside the instrument. *Id.* In fact, a court in this situation should take into account "all operative usages and . . . all the circumstances

---

3. The *Restatement* does not call for this intermediate stopping point in the interpretative process. As a practical matter, such a rule would ordinarily be difficult to apply with any great degree of confidence—a point which *Foley* seems to recognize. My task, however, is to apply Missouri law rather than to revise it, and I will accordingly follow the steps called for by existing Missouri decisions.

prior to and contemporaneous with the making of the [contract], other than oral statements by the parties of what they intended it to mean." *Id.; Restatement of Contracts* § 230 (1931). After all this has been accomplished, if an ambiguity *still* exists the court may then (but only then) hear the parties' oral statements concerning what they understood or intended the provisions in question to mean. *Restatement of Contracts, supra,* §§ 230, 231, 233, 237, 238.

Since the parties have displayed a good bit of concern over the impact of the parole evidence rule upon these things, I note that none of this process of interpretation implicates the parole evidence rule. *Landro v. Glendenning,* 625 F.2d 1344, 1353 (8th Cir. 1980); *Restatement of Contracts, supra,* §§ 238, 242; *Restatement (Second) of Contracts* § 212, Comment b (1981); 3 *Corbin On Contracts* § 579 (1960). It is only *after* this interpretative process has been completed that the parole evidence rule can have application. That is, extrinsic evidence cannot be said to vary the terms of a written agreement—the usage the parole evidence rule prohibits—until by a process of interpretation one has first ascertained what those terms are. Then, but only then, does the parole evidence rule become operative. Obviously this will mean that sometimes the same evidence is utilized for one purpose—to aid in interpreting a document—and rejected for another purpose—to vary the terms of that document once it has been interpreted—but of course there is nothing novel in this concept.

▋ In accordance with these principles, I turn first to an examination of Section V of the contract. As may be seen, when taken at face value the first three lines of that section, preceding the word "except," suggest two things which are relevant to the present inquiry: (a) that there are three *kinds* of items which are to be the "exclusive" property of NIKA—"work systems," "computer programs," and "information;" and (b), that the *specific* items being referred to are those which will be used in actual operations by the City (those which are "necessary for the operation of the systems and programs"). In turn, the use of the word "except," which follows, tends to suggest two things: (a) that its object—the thing which is to be excepted—is something which would otherwise be included among the items described in the preceding clause; and (b), that the "excepted" item or items do not include *all* the items listed in the preceding clause, since the statement of an "exception" which is actually intended to swallow the whole is most unlikely. All this being so, an interpretation which equates the word "program" as used in the phrase "except the City rewrite of the Naces III Program," with the word "program" as used in the preceding descriptive term "computer programs," is certainly reasonable.

From an examination of Section V alone, however, that interpretation is by no means inevitable, since without proceeding further the significance of the words "the City rewrite" is unknown, and since the word "Program," particularly in being capitalized and in being used without the word "computer," might conceivably have reference to something other than a "computer program." But a reading of the other portions of the contract, particularly Section I.A.1., clearly tends to confirm that interpretation. First, Section I.A.1. gives content and meaning to the term "the City rewrite." As specified therein, NIKA is to deliver "the Naces III Computer Program" to the City. The City will then "install it [the "NACES III Computer Program"] on computers provided by the City." Pursuant to all of this, NIKA is to provide an "experienced designer/programmer" who will write specifications "for the rewrite of the NACES III by the City," and the City shall "[m]odify, adopt and make such changes as are necessary to make the NACES III Program run properly on City computers." Accordingly, when read as a whole Section I.A.1. makes reasonably clear that the thing which is to be "rewritten" is a "computer program" (or programs), and that it is the City which is to do the physical task of "rewriting." Sec-

ond, Section I.A.1. also demonstrates that there is nothing significant in the fact that Section V uses the word "Program" as capitalized and without the word "computer." Section I.A.1. does the same at various places, but makes clear that the thing being referred to therein is the "Naces III Computer Program."

A review of the contract as a whole also tends to confirm the fact that the words "work systems," "computer programs" and "information," as used in Section V, are indeed meant to refer to three different kinds of things, to be dealt with in different ways by the parties. As noted, Section I.A.1. deals with the subject of computer programs and the parties' respective obligations in that connection. Section I.A.2., in turn, deals with an "item list" (a "list of items which are required as materials or services in the repair of dwelling units"), "specifications" (for the "actions" involved in removing, installing, repairing, cleaning or painting), and "unit costs" for each "action/item/specification"—in short, the "information" segment of the system. Finally, Section I.A.3. sets forth NIKA's obligations in furnishing various manuals, charts, forms and other documents for use by the City—a rather obvious reference to those things which would be included in the category of "work systems." And a review of Sections I.A.1., I.A.2. and I.A.3. also demonstrates that, of these various things, the only one which the City itself was to "rewrite" was the computer programs segment of the system.

Taken together, these points furnish strong support for NIKA's suggested interpretation of Section V. In fact, NIKA argues that they confirm its position and that any inquiry outside the instrument itself is unnecessary. See *Foley Co. v. Walnut Associates, supra.* The City urges, however, that the use of the term "computer specifications *program*" [emphasis added] in the final "Whereas" clause of the contract preamble, in a rather obvious reference to the entirety of the Naces III system, and the definition of "computer program" as including "supporting data in any form," set forth in Section 1. of Part II

of the contract, continue to render the matter uncertain.

When analyzed, the City's first point is not particularly impressive. Given what has been said before, it would seem relatively clear that the term "computer specifications program," as it appears in the preamble to the agreement, uses the word "program" in a considerably different sense than does the term "the City rewrite of the NACES III program" in Sections I.A.1. and V. On its face, however, the definition of "computer programs" given in Section 1. of Part II of the contract is sufficient to leave the question in some doubt. Accordingly, I turn to extrinsic evidence, including "all operative usages and ... all the circumstances prior to and contemporaneous with the making of the [contract], other than oral statements by the parties of what they intended to mean." *Foley Co. v. Walnut Associates, supra.*

In this connection I note, first, that the City's original request for proposals indicated its desire for a contract which would include an option to purchase whatever specifications system was adopted. And in fact the City's position in this lawsuit is that the present contract accomplishes precisely that, at least to the extent of acquiring a joint interest in the system. Because of the expense involved, however, NIKA had never before sold the Naces III system, and its proposal to the City did not contain any such option—an omission which must surely have been apparent to Bowers and Threatt. Nor was any such option ever discussed by the parties in their negotiations.

Second, the City's rehabilitation loan program was projected to run for at least a three-year period of time. NIKA initially sought a contract which would cover that entire three-year period. The City, however, would agree only to a one year contract term, although leaving open the possibility that if NIKA's performance was satisfactory the contract might be extended. In such circumstances it is difficult to accept that NIKA intended to give up, for the

same contract price, the only bargaining chip it might have in connection with such a renewal (its continued "exclusive" ownership of the "work systems" and "information" components of the system), or that Bowers and Threatt, upon reflection, would have understood that it was doing so.

Third, I note that the original contract draft submitted by Gray, and reviewed at least by Bowers, contained a provision identical to the first portion of Section V, absent the exception clause. That original language was carried forward in redrafts prepared by Bowers. The exception clause, relating to the "City rewrite of the Naces III program," was added only after the parties determined that NIKA's computer programs would need to be rewritten for use on the City's computers and that the City, rather than NIKA, would carry out that task. Given the fact that this rewriting effort would cost the City approximately $9,000 and that the rewritten computer programs, by themselves, would have a continuing value to the City, together with the fact that NIKA would retain its own computer programs and would obtain a joint interest in the rewritten programs as well, the reason for adding the exception becomes apparent. By the same token, however, the natural interpretation of such circumstances is that the exception was intended to be no more broad than the subject which gave rise to it.

Fourth, the evidence concerning the parties' negotiations reveals that the entirety of Part II of the contract, including Section 1., was added by Bowers simply to cover all the various matters required by HUD in City contracts under which federal funds were to be expended. The portion of Section 1. upon which the City relies demonstrates that point, by granting *to the United States* certain rights in "original computer programs" and other materials produced by "activities undertaken as a result of" the contract. The provision would not have had application to the subjects involved here in any event, since according to the unrebutted testimony of Mr. Gray there were no "original" computer programs produced or to be produced under the contract with the City. In such circumstances it would be inappropriate to conclude that the definition of "computer programs" used in Section 1. of Part II was intended by the parties to control Section V of Part I, where both the language of the latter section and the parties' negotiations leading to it dictate an opposite interpretation.

Finally, the evidence presented convinces me that trade usage in the computer science and data processing fields ascribes a specific, and limited, meaning to the term "program." As used there, "program" means "computer program," and refers, by definition, to "a set of instructions to a computer in a specific computer language." A "program" does not ordinarily refer to "information," even when it has been stored in a computer, nor does it refer to "work systems." In fact, both the latter terms have their own accepted definitions. All this squares perfectly with the interpretation NIKA claims for Section V. Furthermore, these definitions and limitations were well known to the City, at least in the general sense, since the testimony on them comes in part from one of the City's own employees in its own highly sophisticated computer department. Even if Threatt and Bowers were unaware of these facts they were certainly in a position to learn of them; and certainly the City, itself, is in a poor position to argue that it should not be held to a knowledge of relevant trade usages.

Consideration of all these additional matters from the objective viewpoint of a third person, see *Restatement of Contracts, supra*, § 230, Comment a, convinces me that the only appropriate interpretation to be given Section V is that advanced by NIKA: that the term "City rewrite of the Naces III Program" means the City's rewritten version of the Naces III *computer* program, and that the term does not include the "work systems" or "information" components of the Naces III system. No further ambiguity remains, in my judgment, and I accordingly reject any consideration

of statements of intention or understanding by the parties or their representatives.[4]

## III.

### CONVERSION

With the foregoing interpretation placed upon Section V of the contract, it is clear that NIKA retained the "exclusive" ownership of the "work systems" and "information" components of the Naces III system, subject only to the City's right to use those components during the contract period. When the contract terminated on August 31, 1977, so did the City's right to the various items which made up those components.

It might be possible, as NIKA suggests, to imply a promise by the City to return such items upon completion of the contract, and thus to decide this case upon a breach of contract basis. In the circumstances, however, I find it more simple, and perhaps more analytically sound, to determine matters under plaintiff's alternative theory of conversion. See generally *Price v. Ford Motor Credit Company*, 530 S.W.2d 249, 255 (Mo.App.1975).

■ It is the law in Missouri,[5] as generally elsewhere, that the tort of conversion exists in the unauthorized assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owner's rights, *Houston v. Columbia Federal Savings & Loan Ass'n.*, 569 S.W.2d 211, 214 (Mo.App.1978); *Dewey v. American Stair Glide Corp.*, 557 S.W.2d 643, 649 (Mo.App.1977), although this general statement must be qualified by an understanding that conversion is actual-ly concerned with possession, not title, and that its essence is not in the acquisition of the property by the wrongdoer, but rather in the wrongful deprivation to the owner. *Price v. Ford Motor Credit Co., supra.* Perhaps the best shorthand definition is that of "a distinct act of dominion wrongfully exerted over the personal property of another in denial of or inconsistent with the latter's rights therein." *Fireman's Fund Ins. Co. v. Trippe*, 402 S.W.2d 577, 581 (Mo.App.1966). Thus, conversion can exist in a refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was not improper. *Houston v. Columbia Federal Savings & Loan Ass'n., supra; Arnold v. Prange*, 541 S.W.2d 27, 30 (Mo. App.1976). And generally speaking, a defendant's good faith or lack of knowledge is no defense in an action for conversion. *Coffman v. Faulkner*, 591 S.W.2d 23, 26 (Mo.App.1979).

■ Given these principles, there can be no doubt that an act of conversion is shown by the facts of this case. Following August 31, 1977, the items included in the Naces III "work systems" and "information" components were NIKA's "exclusive" property, unburdened by any contract permitting their use by another. NIKA's first request for a return of those items was ignored, while its second and following requests were met by an outright refusal. A good faith belief that such refusals were justified or appropriate is no defense under the facts shown here.

■ As the person who directed those things, Threatt would be personally liable therefor. It is a familiar principle

---

**4.** Even if I were to go further, to consider the parties' testimony as to what they intended or understood Section V to mean, the result would be the same. As stated in the *Restatement (Second) of Contracts* § 201 (1981), where the parties have "attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made ... that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party." Given the facts found above, the City clearly "had reason to know" the meaning given Section V by NIKA. The converse is not true.

**5.** Since Missouri is clearly the state with the most significant relationship to the tort aspects of this matter, Missouri law will be applied to that subject. *Daniel Hamm Drayage Co. v. Waldinger Corp.*, 508 F.Supp. 390, 394–95 (E.D.Mo. 1981), *aff'd. in part, mod. in part* 666 F.2d 1213 (8th Cir.1981); *Kennedy v. Dixon*, 439 S.W.2d 173, 180–85 (Mo.1969).

that one who orders or directs the doing of an act is as liable for its consequences as he would be for his own personal conduct, if he knows or should have knowledge of the conditions under which the act is to be done. See *Restatement (Second) of Torts* § 877, Comment a (1979). This is so even though the person in question is himself an agent or servant, acting for and on behalf of his principal or master. See *Restatement (Second) of Agency* § 344, Comment a; § 349 (1958). Nor, in the circumstances of this case, can I accept Threatt's argument that his acts were shielded by the doctrine of "official immunity." It is of course true that certain public officials enjoy immunity from suit with respect to the performance of "discretionary" (as opposed to "ministerial") duties or functions. *State ex rel Eli Lilley & Company v. Gaertner,* 619 S.W.2d 761, 765 (Mo.App.1981). In order for conduct to be "discretionary" in this sense, however, it must not only involve the exercise of judgment and discretion, but must also involve the sort of truly basic policy-making functions that represent "a manifest exercise of the sovereign's power—those decisions which go to the very essence of governing." *State ex rel Eli Lilley & Company v. Gaertner, supra;* and *cf. Owen v. City of Independence,* 445 U.S. 622, 648–49, 100 S.Ct. 1398, 1414, 63 L.Ed.2d 673 (1979); *Griffin v. United States,* 500 F.2d 1059, 1063–64 (3d Cir.1974). Here, the decision made by Threatt hardly classifies in any event as one involving a basic policy making function "which [goes] to the very essence of governing." Perhaps more importantly, however, that decision was not, in either the ordinary or the legal sense, "discretionary" at all. Threatt had no "discretion" to withhold NIKA's property from it. The parties' rights in that connection were fixed by their contract and by the law; not by Threatt's discretion. Compare the analysis of similar points in *Owen v. City of Independence,* 445 U.S. 622, 649, 100 S.Ct. 1398, 1414, 63 L.Ed.2d 673 (1979), and *Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956).

It would likewise seem clear that Threatt's actions were ones taken within the course and scope of his employment by the City, for and on behalf of the City. Threatt was an Assistant City Manager in charge of community development, and the person on behalf of the City who had overall responsibility for the program in which NIKA was involved. His directives concerning the "work systems" and "information" components of the Naces III system were made for the City's benefit, not his own; and it is the City, rather than Threatt personally, which has continued to use those components. Further, Threatt was clearly a "servant" in the legal sense, since he was an employee of the City and his performance of work was obviously subject to City control. In these circumstances Threatt's actions would ordinarily be imputed to his employer under well established respondeat superior principles. See generally *Restatement (Second) of Agency* §§ 219, 220, 228, 229, 231, 244 (1958).

The City contends, however, that it is shielded from any such liability by virtue of the doctrine of sovereign immunity. I believe that argument must be rejected. It appears that Missouri law, while perhaps less than fully developed on the subject, is or would be in accord with the general rule that a municipality's sovereign immunity does not extend to the so-called "intentional" property torts of direct trespass and conversion, regardless whether an exercise of "governmental" (as opposed to "proprietary") functions is involved. See 4 *Sands & Libonoti, Local Government Law* § 27.04, at 27–15 (1982); 18 *McQuillian, Municipal Corporations* §§ 53.11, 53.24(b) (3d ed. 1980); 1 A *Aniteau, Municipal Corporation Law* § 11.14 (1980); 2 *Harper and James, The Law of Torts* § 29.6 at 1626 (1956); 63 *C.J.S. Municipal Corporations* § 757, at 50–1; § 772, at 72–3 (1950). As regards conversion that principle was noted, with apparent approval, many years ago in *Connelly v. City of Sedalia,* 222 Mo.App. 109, 2 S.W.2d 632, 634 (1928), although the court did not directly rule the issue, since it concluded that the officers

involved were acting outside the scope of their authority in any event. And Missouri courts have on several occasions held a municipal corporation liable for an act of trespass, without regard to whether "governmental" or "proprietary" functions were involved. See *Hunt v. The City of Boonville*, 65 Mo. 620 (1877); *Dooley v. Kansas City*, 82 Mo. 444 (1884); *Schmidt v. City of Tipton*, 89 S.W.2d 569 (Mo.App. 1936); and cf. *Corrington v. Kalicak*, 319 S.W.2d 888, 892–93 (Mo.App.1959). Since, as Aniteau suggests, 1 A *Aniteau, Municipal Corporations Law, supra,* this rule is closely related to and perhaps merely reflective of the theory of inverse condemnation,[6] which Missouri courts have long recognized, see, e.g., *Greene v. St. Louis County*, 327 S.W.2d 291, 299 (Mo.1959); *Reorganized School Dist. No. 2 v. Missouri Pac. R. Co.*, 503 S.W.2d 153, 160

(Mo.App.1973); *Harris v. L.P. & H. Const. Co.*, 441 S.W.2d 377, 381 (Mo.App.1969), and since in fact the Missouri decisions hold that in an inverse condemnation situation the property owner will have a choice of several remedies,[7] including not only an inverse condemnation claim as such but also a common law tort action for damages, see *Twiehaus v. Wright City*, 412 S.W.2d 450, 453 (Mo.1959); *Greene v. St. Louis County, supra; Beetschen v. Shell Pipe Line Corporation*, 248 S.W.2d 66, 70 (Mo.App.1952), it seems reasonably clear that Missouri law does not and never has extended the shield of sovereign immunity to a municipality's act of conversion of the instant sort.[8]

▮ I conclude, accordingly, that the City is liable in conversion for its appropriation of the "work systems" and "informa-

---

**6.** Under the theory of "inverse" condemnation, a governmental entity, or other entity which possesses the power of eminent domain, will be liable to the owner of private property whenever the entity, without any attempt at exercising its powers of eminent domain, illegally appropriates or seizes that property. 1 A *Aniteau, supra* § 11.18.

**7.** In the original version of the opinion in this case, I also held that the Fifth and Fourteenth Amendments would prevent a recognition of sovereign immunity in connection with plaintiff's conversion claim. That holding was technically inaccurate, and has been withdrawn from the opinion. It is generally said that the Fifth and Fourteenth Amendments *do* effect a waiver or nullification of sovereign immunity in respect of a "taking," see generally 3 *Nichols on Eminent Domain, supra* § 8.1[4], so as to permit a direct action to compel the same relief a formal condemnation procedure might have provided. *Id.* Such an action is of course now commonly known as an "inverse condemnation" action. *Id.; and cf. United States v. Clarke*, 445 U.S. 253, 256–58, 100 S.Ct. 1127, 1129–30, 63 L.Ed.2d 373 (1980). That does not mean, however, that sovereign immunity is necessarily waived or nullified as to other potential causes of action (such as conversion or trespass), 3 *Nichols on Eminent Domain supra* § 8.1[4], and some states have held that an "inverse condemnation" action is the only one available. *Id.* The distinction can be material, particularly with respect to the availability of punitive damages. In any event, however, as noted in the text above, Missouri law does not recognize sovereign immunity as a bar to suit against a municipality for the "intentional" property torts of direct trespass and conversion,

and in fact specifically recognizes that when an informal or *de facto* "taking" occurs the property owner will have several alternative forms of relief available, including not only an "inverse condemnation" action as such, but a common law tort action for damages for trespass, etc., as well.

**8.** As noted, plaintiff's claim based upon the theory of a taking without compensation was dismissed as failing to state a claim upon which relief could be granted. In view of the result reached upon plaintiff's conversion theory, it is unnecessary that I formally reconsider that earlier ruling. With the greatest of respect for the predecessor judge who granted the motion, however, I must note that I view the ruling as questionable. That holding was based upon several Court of Claims decisions which indicate that "where the government possesses property under color of right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment," *J.J. Henry Co., Inc. v. United States*, 411 F.2d 1246, 1249, 188 Ct.Cl. 39 (1969), and that "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States*, 572 F.2d 786, 818, 215 Ct.Cl. 716 (1978). I have no quarrel with those general statements, but I do not believe the mere existence of a prior contractual relationship, even one which related to the property in question, can automatically serve to insulate a governmental entity from a taking claim. Where, as here, that entity's contractual rights have expired, and it refuses to return the property upon appropriate demand and instead keeps it for its own use, it is difficult to see how it can be said that a taking has *not* occurred.

tion" components of the Naces III system. Under Missouri law it has no sovereign immunity for that act.

■ Having dealt with NIKA's claims against the City and Threatt, I turn briefly to a consideration of the claims against Bowers. I reach a different result there. It is clear that Threatt, rather than Bowers, made the decision to withhold NIKA's property, and directed the same. It is true that Threatt relied upon Bowers' legal opinion in making that decision, but however unfortunate Bowers' advice may have been it did not breach any duty Bowers owed directly to NIKA, nor is Bowers shown to have acted in bad faith or with an appreciation of the incorrectness of his opinion, so as to render him liable as an aider and abettor. See generally *Restatement (Second) of Torts* § 876 (1979). In the circumstances, NIKA's claim against Bowers must be denied.

## IV.

## DAMAGES

An assessment of NIKA's damages has proved troublesome. Both sides produced highly qualified experts who rendered opinions on the matter. Those opinions—and the methodology used to reach them—were wildly divergent, however, and in the final analysis I find myself unable to accept either opinion in its entirety.

■ As a general rule, the measure of damages in a conversion case is the same as that in any other case involving personal property which is taken or destroyed: the reasonable market value of the property at the time of its conversion. *Breece v. Jett*, 556 S.W.2d 696, 709 (Mo.App.1977); *Dobbs, Remedies* §§ 5.10, 5.14 (1973). However, as Judge Nangle pointed out in *Chevron Chemical Co. v. Streett Industries*, 534 F.Supp. 801, 805 (E.D.Mo.1982), there may

be more than one "market" involved; and where personal property is held by the owner as stock for sale rather than for consumption, the relevant "market" is that in which the property was acquired by the owner rather than that in which he would resell it, with any question of "lost profits" to be considered separately. *Id.;* and *cf. Dobbs, supra.* This rule would appear to be as applicable to conversion cases as to those involving negligence.

■ The property involved in this case was obviously not "stock for sale." Nor did NIKA acquire that property in any sort of conventional "market;" rather, it developed and produced the items by its own efforts. The rule mentioned above does, however, typify the general theory which I understand to be applicable: that in cases where the distinction is material, "value" is ordinarily determined by reference to what it would cost the owner, at the time of conversion, to produce or acquire the property in question, rather than by reference to what it would cost the convertor to produce or acquire that property. Any other rule would, in the usual commercial setting, allow an automatic recovery of lost profits without a showing of actual lost sales (or, as in this case, lost opportunities for leasing or licensing), and in addition would tend to cut across the theory for the rule—discussed below—which generally allows an assessment of prejudgment interest, as a measure of damages rather than as interest, in conversion cases. I conclude, accordingly, that the appropriate *base* measure of damages here should be the cost to NIKA of producing the converted items.

Defendant's expert had not been furnished sufficient information regarding the cost of producing those items, and declined to express any opinion on the subject.[9]

---

**9.** I must also reject the valuation opinion which defendant's expert, Mr. Doyle Jones, did offer. Mr. Jones based that opinion upon an attempted allocation of a portion of the contract payments to the items in question, multiplied by the five-year period during which he felt those items would have continuing value. This resulted in a

discounted present value figure of either $58,-441 or $20,661, depending upon how he allocated figures between items and services. As he admitted, however, if the contract amounts charged did not fairly reflect the actual value of the items involved, his resulting figures would be inappropriate. From Mr. Gray's testimony, I

Plaintiff's expert placed the cost of producing the items at $147,875. This figure was said to represent the cost which would have been incurred by *the City* in producing those items, but so far as I can tell from the approach and cost factors utilized, that amount would reflect NIKA's costs as well. Since those calculations and figures appear reasonable, particularly as they might pertain to NIKA's costs, I will accept the amount of $147,875 as the appropriate base measure of NIKA's damages.

■ The next question is whether lost "profits" in any sense—lost mark-up value on resale, loss of income, or other earnings loss—should be allowed. In Missouri, there may be a recovery for such a loss when the same is shown to be "the natural and probable consequence of the act or omission complained of, provided the amount thereof is shown with reasonable certainty." *Chevron Chemical Co. v. Streett Industries, supra; Eastman Kodak Stores, Inc. v. Summers*, 377 S.W.2d 476, 481 (Mo.App.1964). Thus in the present case it would be necessary both for NIKA to show that a profit would have been realized from the items converted, but for the conversion, and to show the amount thereof with reasonable certainty. *Chevron Chemical Co. v. Streett Industries, supra* at 803–04.

In a conversion case such as this one, as opposed to a negligence case, there may be rather persuasive reasons for considering the first requirement satisfied simply by proof of the defendants' appropriation, since obviously plaintiff expected a return on its investment in the converted items, and since obviously at least the defendants felt the property was worth appropriating. Determining the amount of any lost profit in this case, however, presents real difficul-

ties. In the first place, the items involved were not intended for sale and had never been the subject of sale. In those circumstances any effort to determine an appropriate outright sale value is bound to be somewhat speculative. Second, and perhaps more importantly, the expert testimony leaves me less than satisfied with respect to the useful lifespan of the converted items—a critical factor in any valuation approach based upon an extrapolation of the license fees NIKA might ordinarily charge for the items. Plaintiff's expert testified, without explanation or amplification, that he used a period of ten years for this factor. Defendants' expert put the period at five years, while explaining that the necessity of updating the data and revising the forms made even that a liberal figure. Unfortunately, neither opinion was sufficiently explained to provide me any real basis for an intelligent assessment of these positions; and while one might, willy-nilly, simply select one figure or the other, or perhaps choose a median figure, these seem less than satisfactory approaches.

■ There is, however, an alternative at hand. As mentioned previously the general common law rule in conversion cases is to allow prejudgment interest on the value of the converted item, not as interest but rather as an admeasure of damages. See *Dobbs, supra;* 1 *Harper and James, The Law of Torts,* § 2.36, at 190–192 (1956). The theory is that this allowance of interest, as damages rather than as interest, will serve generally to compensate the owner for ordinary consequential damages in the nature of loss of use or lost earnings. *Lack v. Brecht,* 106 Mo. 242, 65 S.W. 976, 980 (1901). In fact, the common law rule, at least in Missouri, was that in conversion cases courts would not undertake to measure such loss by the

find that in fact to be the case. Mr. Gray explained that he accepted an overall contract price which was much lower than usual—in fact one so low that it would, by itself, create a business loss—because he hoped to obtain a contract for the remaining two years of the program, which would allow him to show an overall profit, and because he hoped to use the City contract as an entree to long term business

relationships in the Kansas City area. He also explained that the way in which that one-year contract price was allocated and paid was a matter of convenience and had nothing to do with actual values for the items furnished during any given period. I accept that testimony, and accordingly find Mr. Jones' testimony on that subject to be of no help.

profits which might have accrued, but rather would approach the matter by applying the ruling rate of interest—not as interest but by way of compensatory damages. *Lack v. Brecht, supra.* This rule, at least in a discretionary form, has now been codified in Missouri. See § 537.520, R.S.Mo. 1969 (as amended); *Lack v. Brecht, supra; Independence Flying Service, Inc. v. Ailshire,* 409 S.W.2d 628, 631–32 (Mo.1966); *Commercial Credit Corp. v. Joplin Auto Auction Co.,* 430 S.W.2d 440, 444–45 (Mo. App.1968). And while the statute is permissive and presumably would not be utilized where a specific award was made for consequential damages, including lost earnings or profits, it can serve its purpose quite well here in lieu of any more definitive approach to the problem. Accordingly, additional compensatory damages, in an amount equal to the interest which would have been earned on $147,875 from the date of September 26, 1977, the date of NIKA's first demand letter, see *Independence Flying Service, Inc. v. Ailshire, supra,* will be awarded.

It is clear, however, that the "interest" referred to in § 537.520 is not calculated at "market" rates, as plaintiff suggests, but rather at the so-called "legal rate"—that is, the rate allowed on judgments or where the rate is not otherwise specified. See *Lack v. Brecht, supra.* As set by § 408.020, R.S.Mo.1969 (as amended), that rate would be 6% until September 28, 1979, and 9% thereafter. *Dependahl v. Falstaff Brewing Corporation,* 653 F.2d 1208, 1220 (8th Cir.1981); *Senn v. Commerce-Manchester Bank,* 603 S.W.2d 551, 553–54 (Mo.1980).

The final matter for consideration is plaintiff's claim for punitive damages. In Missouri, damages of that nature may be awarded when a defendant's tortious act is intentionally committed, without just cause or excuse. *Price v. Ford Motor Credit Company, supra* at 253. The defendant, however, must either know the act to be wrongful at the time of its commission, or act in reckless disregard of the plaintiff's rights, *id.,* and a good faith mistake is a defense to such a claim. *Id.* Here, in reaching his decision not to return the property in question, Threatt relied upon Bowers' legal opinion. Although plaintiff urges to the contrary, I find upon a full consideration of the evidence that Threatt's action, although in error, was taken in good faith. Plaintiff's claim for punitive damages must accordingly be denied.

## IV.

### JUDGMENT

For the foregoing reasons it is

ORDERED that upon Count III of its Third Amended Complaint plaintiff shall have judgment against defendants James Threatt and the City of Kansas City, Missouri, jointly and severally, in the sum of $147,875, together with additional compensatory damages in an amount equal to the amount of interest which would be earned on the sum of $147,875 at the rate of 6% per annum from September 26, 1977, to and including September 27, 1979, and at the rate of 9% per annum thereafter, and for its costs herein incurred and expended; and it is further

ORDERED that defendant James Bowers shall have judgment on plaintiff's claims against him, and for his costs herein incurred and expended; and that plaintiff's claims against defendant James Bowers shall be and are hereby dismissed, with prejudice; and it is further

ORDERED that plaintiff's claims under Count V of its Third Amended Complaint, and plaintiff's claims for punitive damages, shall be and are hereby dismissed, with prejudice.

## ON MOTIONS TO AMEND JUDGMENT

Both plaintiff and defendant City have moved that the judgment previously entered in this case be amended.[1] Plaintiff's request, in part, is that I reconsider the

---

**1.** Pursuant to the court's order of October 12, 1983, execution on the judgment was stayed pending a resolution of the issues raised by the parties' present motions.

court's order of February 24, 1982, which dismissed plaintiff's § 1983 allegations as failing to state a claim upon which relief could be granted, and that I now enter judgment in plaintiff's favor on that claim, together with an award of prevailing attorneys' fees under 42 U.S.C. § 1988. In addition, plaintiff asks that the judgment be amended to provide that NIKA will remain "the exclusive owner of the converted property" and to require that the City "return all copies of the converted property to NIKA forthwith;" to specify that "post judgment interest is to be allowed on all compensatory damages, including prejudgment interest;" and to provide that prejudgment interest is to be compounded annually. For its part, the City requests that the judgment be amended to specify that upon payment of the judgment herein the City will, as against NIKA, be the owner not only of the converted items, but also of any copies thereof in NIKA's possession. These matters will be dealt with *seriatim*.

## I.

### PLAINTIFF'S § 1983 CLAIM

In dismissing NIKA's § 1983 allegations my predecessor relied primarily upon *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), reasoning that NIKA's claim was in essence one for a deprivation of property without due process, which was foreclosed, as was the claim in *Parratt*, by the fact that there was an adequate post-deprivation state remedy. For the reasons which follow I now reaffirm that dismissal, although on a somewhat different analysis.

The decision in *Parratt* has led to debate in the lower federal courts, as well as amongst legal scholars, as all concerned have attempted to assess its basic rationale and implications. The principal conflicting theories regarding *Parratt*, as well as a resume of the legislative history of § 1983 and its subsequent application by the courts, are all set forth in the excellent general analysis of those subjects found in *Barnier v. Szentmiklosi*, 565 F.Supp. 869 (E.D.Mich.1983).

As Judge Joiner pointed out in *Barnier*, it is critical, both in applying § 1983 and in understanding *Parratt*, to focus clearly upon the specific constitutional or statutory right which a plaintiff claims has been infringed; and in particular, insofar as constitutional rights are concerned, to distinguish between what might be collectively termed "substantive" constitutional rights on the one hand, and so-called "procedural due process" rights on the other. With respect to the former category—consisting generally of those rights (except the procedural due process rights of the Fifth Amendment) guaranteed under the first eight Amendments to the Constitution, to the extent they have been made applicable to the states through the Fourteenth Amendment,[2] the privileges and immunities and equal protection rights granted by the Fourteenth Amendment, the rights covered by the Thirteenth, Fifteenth, Nineteenth, Twenty-Fourth and Twenty-Sixth Amendments, certain other rights having a source in the body of the Constitution,[3] and finally those rights which, while having no direct textual basis in the Constitution, have nevertheless been recognized under the much-maligned label of "substantive due

**2.** Such rights would include all of those under the First Amendment, all those under the Fourth Amendment, all those under the Fifth Amendment with the exception of the Grand Jury clause, all those under the Sixth Amendment, and all those under the Eighth Amendment. See *Nowak, Rotunda and Young, Constitutional Law* 414–15 (1978). In addition, although the Supreme Court has never addressed the issue, it would seem reasonably clear that the rights guaranteed under the Third Amendment would also be included in this category.

See *Engblom v. Carey*, 677 F.2d 957, 961 (2nd Cir.1982).

**3.** The list would include those rights deriving from the Contract Clause, U.S. Const. art. I, § 10; those deriving from the portion of the Ex Post Facto Clause which pertains to the states, U.S. Const. art. I, § 10, cl. 1; and those deriving from the portion of the Bill of Attainder Clause which pertains to the states, U.S. Const. art. I, § 10, cl. 1.

process" [4]—the right, *in the form in which it is recognized,*[5] is essentially absolute, and generally may not constitutionally be infringed no matter how much procedural due process is accorded. Thus the City in the present case could not, even with the observance of every procedural nicety thus far devised, constitutionally mandate its citizens' belief in and adherence to a particular religion; and if it did enact such a measure the fact that the state provided a suitable remedy for the transgression, or required a full adversarial or legislative hearing prior to it, would be quite beside the point. "Procedural due process" rights, on the other hand, derive from the due process clauses of the Fifth and Fourteenth Amendments, which command that a person shall not be deprived of "life, liberty or property *without due process of law*" (emphasis added). Since the sovereign *can* deprive one of life (execution), liberty (arrest, imprisonment) or property (attachment, replevin, etc.) *if* appropriately fair procedures are employed, the inquiry (once a protected interest is identified) must focus on the adequacy of those procedures. With respect to *that* inquiry the existence of an adequate post-deprivation state remedy may, in certain instances, be all important.

*Parratt* was, as an examination of the opinion will disclose, a pure "procedural due process" case. It was *not* a "taking" case under the "just compensation" clause of the Fifth Amendment as incorporated in the Fourteenth, since there was no suggestion that the defendants physically appropriated the hobby kit in question (the allegation was, instead, that their negligence allowed it to be lost), or that it was applied to some "public use." Plaintiff's claim was simply that he had been deprived of his property; and the Court's inquiry, accordingly, was focused upon what "procedural due process" would require in those circumstances. Since, with respect to a deprivation which results from negligence, a pre-deprivation procedure could hardly be required, the Court quite naturally examined the adequacy of the only other general procedural area that might be involved—that of post-deprivation remedies. Since the state provided an adequate post-deprivation remedy by way of suit, due process was found satisfied. *Parratt v. Taylor, supra* 451 U.S. at 535, 101 S.Ct. at 1912.

In contrast to *Parratt,* the present case postures a "taking" claim alleged to arise under the "just compensation" clause of the Fifth Amendment as made applicable to the states through the Fourteenth Amendment, see *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980), rather than a procedural due process "deprivation" claim. The distinction is material, not only because the "just compensation" and "due process" clauses are separate and distinct provisions, based on different concepts and requiring a separate analysis, *Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n.,* 400 F.Supp. 1369, 1381 (D.Md.1975); Comment, *Testing the Constitutional Validity of Land Use Regulations: Substantive Due Process as a Superior Alternative,* 57 Wash.L.Rev. 715 (1982); *and see also San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 641 n. 4, 101 S.Ct. 1287, 1298, n. 4, 67 L.Ed.2d 551 (1981) (Justice Brennan dissenting), but more importantly, as far as any direct connection with *Parratt* is concerned, because the "just compensation" clause guarantees a substantive constitutional right, not simply a right to procedur-

---

**4.** The list which follows is by no means exhaustive, and the area is always subject to Supreme Court redefinition, but some matters which, as of today, could be included are freedom of association, the right to vote and participate in the electoral process, the right to interstate travel, and the right to privacy in certain forms. See generally *Nowak, Rotunda and Young, supra* at 418–19.

**5.** As we shall see, it is not enough merely to identify the right; one must also understand the content of and limitations upon the right, as the same have been developed over the years by the, Supreme Court.

al due process. *Parratt* does not, *as such,* mandate the result to be reached in this case.

Having said this much, a literal reading of the "just compensation" clause might in turn appear to suggest that plaintiff has demonstrated a § 1983 cause of action here, assuming that a "taking" has been shown, as I believe it has.[6] That is, as plaintiff would have it, its property was taken by the City, for a concededly public use, yet no "just compensation" was paid; and thus plaintiff's constitutional right under the "just compensation" clause was denied. And indeed that was the initial conclusion this court reached.[7] A deeper analysis, however, reveals that conclusion to be in error; and demonstrates as well that if it is important to recognize the distinction between substantive constitutional rights and those involving procedural due process, it is no less important to understand the precise content and contours of a substantive constitutional right.

 It will be helpful, in this connection, to note two particular features of the federal "just compensation" clause, as it has been construed by the courts. First, the clause is not a grant of the power to take private property for a public use (generally referred to as the power of eminent domain); that power is inherent in any sovereign, *Kohl v. United States,* 91 U.S. 367, 371–74, 23 L.Ed. 449 (1875); *United States v. Gettysburg Electric R. Co.,* 160 U.S. 668, 679, 681, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1895); *Georgia v. City of Chattanooga,* 264 U.S. 472, 480, 44 S.Ct. 369, 370, 68 L.Ed. 796 (1924), and requires no constitutional or legislative grant, *The Mississippi and Rum River Boom Company v. Patterson,* 98 U.S. 403, 406, 25 L.Ed. 206 (1879); *United States v. Jones,* 109 U.S. 513, 518, 3 S.Ct. 346, 349, 27 L.Ed. 1015 (1883); *Hanson Lumber Co. v. United States,* 261 U.S. 581, 587, 43 S.Ct. 442, 444, 67 L.Ed. 809 (1923). The clause (as with counterpart provisions in state constitutions) is, instead, simply a limitation upon a power which would otherwise be unlimited, *Hanson Lumber Co. v. U.S., supra;* 1 *Nichols on Eminent Domain* § 1.14[2] (Stackman ed. 1981), the effect of which is not to circumscribe the power to take, as such, but rather to create in the owner of the property an absolute right to "just compensation" if there is a taking. See 3 *Nichols on Eminent Domain, supra* §§ 8.1–8.-1[2]. Second, and of particular importance here, is the fact that the clause contains no specific requirements with respect to when, how, or by what procedures "just compensation" is to be determined and paid.

It is in this latter connection that one will discover the flaw in plaintiff's position in the present case. That position is based on the implicit assumption that plaintiff's

---

6. As plaintiff suggests, there can hardly be any doubt that the City's refusal to return the items in question, together with its continued physical possession and use of them, was a physical takeover of those items. Actual physical takeovers of that and other sorts represent the classic and most basic sort of "taking." See *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426–38, 102 S.Ct. 3164, 3171–77, 73 L.Ed.2d 868, 876–84 (1982). The fact that the City's original possession of the items came about by virtue of a contract permitting the same, and the fact that the City believed in good faith, albeit mistakenly, that it had a continued right to keep the items, does not make its retention of them, in the face of plaintiff's rightful demand for their return, any less a "taking." As an examination of the cases demonstrates, the existence of a good faith claim to ownership by the government, whether based on deed, contract or otherwise, has never prevented the matter from being dealt with as a "taking" under the Fifth and Fourteenth Amendments. See, e.g., *Malone v. Bowdoin,* 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); *DSI Corp. v. United States,* 655 F.2d 1072 (Ct.Cl.1981); *Foster v. United States,* 607 F.2d 943, 221 Ct.Cl. 412 (1979); *Bourgeois v. United States,* 545 F.2d 727, 212 Ct.Cl. 32 (1976).

7. On that basis, the court requested further briefing by the parties with respect to the "taking" issue and as to whether Threatt's directive to keep the items could be considered an "edict or act" which represented "official policy" of the City under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[W]ith apologies to all," *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2321, 76 L.Ed.2d 527, 535 (1983), I find now that a determination of those issues is unnecessary, although footnote 6. does set forth some thoughts on the "taking" issue.

"just compensation" right is a right to receive compensation either prior to or at the time of the taking. And indeed one might read the "just compensation" clause in that way; but in fact it has never been so interpreted or applied. To the contrary, the Supreme Court has made quite clear, in a series of decisions extending back many years, that compensation need not be paid or determined in advance of or at the time of taking, so long as the property owner has open to him a method of obtaining compensation with reasonable legal certainty and without unreasonable delay. *Cherokee Nation v. Southern Kansas R. Co.*, 135 U.S. 641, 658–61, 10 S.Ct. 965, 971–72, 34 L.Ed. 295 (1889); *Sweet v. Rechel*, 159 U.S. 380, 400–04, 16 S.Ct. 43, 48–50, 43 L.Ed. 188 (1895); *Williams v. Parker*, 188 U.S. 491, 502–05, 23 S.Ct. 440, 442, 47 L.Ed. 559 (1903); *Crozier v. Fried, Aktiengesellschaft*, 224 U.S. 290, 306, 32 S.Ct. 488, 492, 56 L.Ed. 771 (1911); *Hays v. Port of Seattle*, 251 U.S. 233, 238, 40 S.Ct. 125, 127, 64 L.Ed. 243 (1919); *Joslin Mfg. Co. v. Providence*, 262 U.S. 668, 677–78, 43 S.Ct. 684, 67 L.Ed. 1167 (1922); *Hurley v. Kincaid*, 285 U.S. 95, 104–05, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1931); *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21–2, 60 S.Ct. 413, 414–15, 84 L.Ed. 554 (1939); and see generally 3 *Nichols on Eminent Domain, supra* § 8.71–8.712. Those Supreme Court decisions continue to represent the controlling interpretation of the "just compensation" clause. *Washington Metropolitan Area Transit Authority v. One Parcel of Land, Etc.*, 706 F.2d 1312, 1319–21 (4th Cir.1983), *cert. den.* —— U.S. ——, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983); *Vazza v. Campbell*, 520 F.2d 848, 850 (1st Cir.1975); *Elterich v. City of Sea Isle City*, 477 F.2d 289, 290–91 (3d Cir.1973); *Stringer v. U.S.*, 471 F.2d 381, 383 (5th Cir.1973), *cert. den.* 412 U.S.

943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973); *Kohlasch v. New York State Thruway Authority*, 482 F.Supp. 721, 723 (S.D.N.Y. 1980); *U.S. v. Holmes*, 414 F.Supp. 831, 840–42 (D.Md.1976); *Joiner v. City of Dallas*, 380 F.Supp. 754, 765–66, 772–74 (N.D. Tex.1974) (three judge panel), *aff'd without opinion* 419 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974); *Gigliotti v. Redevelopment Authority of City of New Castle*, 362 F.Supp. 764, 766 (W.D.Pa.1973), *aff'd* 492 F.2d 1238 (3rd Cir.1974). And both those Supreme Court decisions and the more recent lower federal court holdings confirm the fact that the requirements of the "just compensation" clause will be satisfied in this respect if, following a taking by a state or subordinate entity, the property owner has a meaningful ability under state law to sue and collect a judgment from the taking entity. *Sweet v. Rechel, supra; Williams v. Parker, supra; Hays v. Port of Seattle, supra; Washington Metropolitan Area Transit Authority v. One Parcel of Land, Etc., supra; Vazza v. Campbell, supra; Kohlasch v. New York State Thruway Authority, supra; Joiner v. City of Dallas, supra.*

It may accordingly be seen that the "just compensation" clause does not operate to prohibit the sovereign from taking property for a public use, even if compensation is not paid at or before the time of taking. The promise of the clause, rather, aside from the abstract proposition that the property owner shall be entitled to receive "just compensation," is that the property owner shall have a meaningful ability to collect that "just compensation" from the taker. That promise is fulfilled if, in the case of a state or subordinate entity taker, the state provides an adequate remedy by way of suit;[8] and the necessary

---

8. There can, of course, be problems with whether the state has provided an "adequate remedy" by way of suit, either on a general basis or as applied in the facts of a particular case. The former sort of problem may be seen in *Agins v. City of Triburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), and *San Diego Gas & Electric Co. v. City of San Diego, supra*, where property owners who claimed a "taking" by way of excessive land use regulation were restricted to injunctive relief only. At least some members of the Court—perhaps even a majority—felt that if a "taking" was in fact involved, injunctive relief alone would be inadequate. See *San Diego Gas & Electric Co. v. City of San Diego, supra* 450 U.S. at 633–36, 101 S.Ct. at 1294–96 (Justice Rehnquist concurring), 636–61, 101 S.Ct. at 1296–1309 (Justice Brennan dissenting). The

inquiry here, in turn, becomes whether Missouri state law provided such a remedy. That is, of course, precisely the same ultimate question posed by *Parratt v. Taylor, supra.* It should be noted, however, that it is a question reached through an analysis which is, of necessity, different from that employed in *Parratt.*

There can hardly be any question that Missouri law provides the necessary remedy. As the earlier holding in this case demonstrates, plaintiff will, through its state law conversion claim, receive the full amount which has been determined to be the value of the property taken. Had the circumstances been appropriate, plaintiff might even have obtained punitive damages. The judgment obtained will be a general judgment against both the City and its assets and against defendant Threatt. There is no hint that there should be any practical difficulty in collecting that judgment. Furthermore, an "inverse condemnation" claim (in the strict sense) was also available in the state courts, since as the earlier opinion points out the Missouri common law has for some time now recognized that theory. See *Twiehaus v. Wright City,* 412 S.W.2d 450, 453 (Mo.1959); *Greene v. St. Louis County,* 327 S.W.2d 291, 299 (Mo.1959); *Beetschen v. Shell Pipe Line Corp.,* 248 S.W.2d 66, 70 (Mo.App.1952). Injunctive relief was likewise available. *Id.* Nor is there anything to suggest that state court procedures, modeled as they are largely upon the Federal Rules of Civil Procedure, would be inadequate to provide plaintiff a full and fair hearing on its claim. In sum, Missouri state law provided a full panoply of rights to plaintiff and a completely adequate forum in which to exercise them. I hold, accordingly, that there has been no denial or infringement of plaintiff's rights under the "just compensation" clause of the Fifth Amendment as made applicable to the states through the Four-

teenth, and thus no claim stated or shown under 42 U.S.C. § 1983.

I recognize that some courts, without much or any discussion of the matter, have entertained § 1983 claims in cases involving an alleged "taking without just compensation." See, e.g., *Wheeler v. City of Pleasant Grove,* 664 F.2d 99 (5th Cir.1981), *cert. den.* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982); *Hernandez v. City of Lafayette,* 643 F.2d 1188 (5th Cir.1981); *Gordon v. City of Warren,* 579 F.2d 386 (6th Cir.1978); *Kinzli v. City of Santa Cruz,* 539 F.Supp. 887 (N.D.Cal.1982); *Ocean Acres Limited Partnership v. Dare City Board of Health,* 514 F.Supp. 1117 (E.D.N.C.1981), *aff'd.* 707 F.2d 103 (4th Cir. 1983). I note, however, that the present issue was not addressed in any of those cases; and, with all respect, in those circumstances I do not feel persuaded by them, particularly in view of the other authorities cited above.

I am also aware that the Supreme Court, in *Lake County Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), dealt with an alleged "taking" claim in the context of a § 1983 cause of action, without any suggestion of a problem in that respect. It is clear, however, that the present question was not raised in that case, and that the Court's attention was focused entirely upon questions of legislative immunity with respect to § 1983 liability and Eleventh Amendment immunity from suit in federal court. Since the Court, quite logically, has never considered itself bound with respect to points (even jurisdictional ones) which were passed on *sub silento* in prior decisions, see, e.g., *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, ——, 104 S.Ct. 900, 917, 78 L.Ed.2d 67 (1984), and since the

---

latter sort of problem may be seen in *Fountain v. Metro Atlanta Rapid Transit Authority,* 678 F.2d 1038 (11th Cir.1982), where the court (although referring to the matter as a "due process" claim) recognized that "an adequate procedure to secure compensation" would suffice, but found plaintiff's allegation that "Georgia proce-

dures have proved inadequate to protect his interests" was at least sufficient, in the circumstances of the case, to state a claim. *Id.* at 1045 n. 13. Where there is not an adequate state remedy, or where plaintiff's claim to that effect appears non-frivolous, a claim under § 1983 would presumably be appropriate.

Court's own earlier decisions which specifically address the core issue here, as well as the implications of its decision in *Parratt*, support the conclusions I reach, I do not believe *Lake County Estates* can be taken as commanding an opposite result.

Whether for failure to state a claim upon which relief can be granted, or alternatively on the merits, based upon the facts found in the court's earlier opinion, plaintiff's claim under 42 U.S.C. § 1983 cannot stand.[9] Plaintiff's request that judgment in its favor be entered on that claim will be denied, and the court's earlier dismissal reaffirmed.

## II.

## REQUEST FOR RETURN OF PROPERTY

Plaintiff also requests that the judgment be amended to require that the City return the items in question, in addition to payment of the damages allowed in the judgment. Although the precise theory upon which that request is made is not altogether clear, it seems to be plaintiff's position that the damages allowed do not include all the post-conversion profits which plaintiff might have earned from the items during the remainder of their useful life; that in turn plaintiff has received less than a full measure of damages for the City's conversion; and that permitting the City to retain the items in those circumstances would result in the City's unjust enrichment. I believe that position is unsound.

 In a conversion case such as this one, where the converted items have not been returned, a plaintiff is of course entitled to recover the reasonable value of those items, as established by appropriate proof. Under the law generally and probably under Missouri law as well, a plaintiff is also entitled, with certain limitations, to recover consequential damages resulting from the conversion—again as established by its proof. See *Young v. Mercantile Trust Co. Nat. Ass'n.*, 552 S.W.2d 247, 250 (Mo.App.1977); and see generally *Restatement (Second) of Torts* § 927; § 918 (1979). Finally, *in the discretion of the trier of fact* a plaintiff may also be allowed additional damages, calculated by way of interest on the value of the converted items from the date of conversion to the date of judgment. See 537.520, R.S.Mo.1969 (as amended); *Commercial Credit Corp. v. Joplin Auto Auction Co.*, 430 S.W.2d 440, 444–45 (Mo.App.1968). In terms of actual damages, a plaintiff is not entitled to more; nor is a plaintiff entitled, on a conversion theory, both to a judgment for the value of the property *and* to a judgment requiring return of the converted items. See *St. Louis Fixture & Show Case Co. v. F.W. Woolworth Co.*, 88 S.W.2d 254, 263 (Mo. App.1935); 1 *Harper and James, The Law of Torts* § 2.36, at 190–91 (1956).[10]

To the extent plaintiff's present argument touches the first of these three elements of potential actual damage, it is in reality a quarrel with the fact that the court has not accepted its capitalization of income method of computing "value." Even if that approach to valuation might otherwise be appropriate in this sort of case, I continue to reject its application here, for the reasons originally stated: aside from its inherently speculative nature in the circumstances of this case, see generally *Dobbs, Remedies* § 5.12, at 395–96 (1973), I am simply not persuaded with regard to the facts upon which it is based.

---

**9.** Whether a "direct" federal cause of action might exist under the Fourteenth Amendment (in effect, a federal "inverse condemnation" cause of action), see, e.g., *Gordon v. City of Warren, supra; Ocean Acres Limited Partnership v. Dare City Board of Health, supra,* and if so the extent to which (if at all) the federal courts should abstain from exercising jurisdiction where the matter involves a local governmental entity, are questions that need not be determined here.

**10.** As defendant correctly notes, if the court could and did order a return of the items in question, the assessment of damages for their value could not stand, since defendant cannot be compelled both to pay for the items and at the same time give them up. Stated shortly, plaintiff cannot have its cake and eat it too.

The only appropriate "value" figure which the proof in the case will support, so far as I am concerned, is that reflected in the judgment: $147,875, as the production or developmental cost of the items at the time of their conversion.

In actuality, plaintiff's argument might seem directed more toward the element of consequential damages, in the sense that plaintiff suggests it should be able to recover the earnings or profits the converted items would produce during the remainder of their useful lives. If that is plaintiff's position, it misconceives the nature and extent of the consequential damages to which the law entitles it. The general rule is that loss of use claims—which would include a loss of earnings claim in the present sense—are ordinarily limited, in a conversion case, to the period it would take a reasonable person to replace the converted items. *Dobbs, supra* § 5.14, at 408; *Restatement (Second) of Torts* § 927 comment o; § 918 comment g (1979). That rule is based upon the general requirement that a plaintiff take reasonable steps to minimize its damages, see *Restatement (Second) of Torts* § 918 (1979), and is particularly appropriate for application in the present case, where plaintiff in fact retained complete copies of all the converted items. In reality there are no consequential damages, as such, even theoretically involved here, unless one can argue the rather speculative proposition that the City, by converting the items in question, not only deprived plaintiff of them but also deprived it of a customer which would otherwise have contracted for their use. And even if there is any merit in that theory, it certainly would not lead to a recovery of lost earnings past the date of a judgment which required the City to pay for those items. Nor, for that matter, is there any proof as to lost profits in any event.

There may be, of course, a rather generalized notion that it is somehow unfair to permit the City, by its act of conversion, to obtain the items in question at plaintiff's cost of producing them and to use them five years before being required to pay even that figure. And in fact, although that notion probably rests more on a theory of unjust enrichment than on any assessment of plaintiff's actual loss here, it is a matter not undeserving of the court's attention. It was in response to that concern that the court exercised its discretion to allow additional damages calculated as interest under § 537.520. The function of an award of that sort, as I understand it, is to provide an additional tool for working justice in a particular case; and that is precisely the function it has served here. By virtue of it, plaintiff will receive additional damages of approximately $72,000. That, coupled with the value of $147,875 placed on the items in question, may not be all that plaintiff would like; but it is all the evidence in this case will support, and it is, in my judgment, quite sufficient to compensate plaintiff for its loss.

Plaintiff has received all the damages to which it is entitled. There is no basis for any reassessment of those damages, and certainly no basis in law or in fact for requiring the City both to pay those damages *and* to return the items.

III.

COMPUTATION OF INTEREST

Plaintiff's final two points concern computation of the additional damages awarded under § 537.520, and assessment of post-judgment interest. Under the first point, plaintiff argues that the additional damages allowed under § 537.520 should be "compounded" annually. Under its second point, plaintiff seeks assurance that all of the judgment awarded will bear post-judgment interest.

Plaintiff's first point must be rejected. Presumably, since the damages allowed under § 537.520 are to be calculated by applying the rate of interest established by § 408.020, R.S.Mo.1969 (as amended), see *Lack v. Brecht*, 166 Mo. 242, 65 S.W. 976, 980 (1901), any questions with respect to "compounding" must also be governed by Missouri interest law. If that is so, § 408.-

080, R.S.Mo.1969 (as amended), would prohibit any such compounding in the circumstances of this case. That statute provides that parties may contract in writing for the payment of interest on interest (previously, not more often than once per year; since the 1982 amendments, not more often than once per month), and has been held, as one would expect, to mean that in the absence of such a written agreement there can be no compounding. See *Stoner v. Evans*, 38 Mo. 461, 463–64 (1866); *Redman v. Hampton*, 26 Mo.App. 504, 510–11 (1887). Since under Missouri law any right to compound interest is a creature of statute (here § 408.080), *Whitworth v. Davey*, 279 Mo. 672, 216 S.W. 736, 737 (1920), and since neither § 537.520 nor § 408.020 contain any contrary provision on that subject, it seems rather clear that Missouri law does not contemplate or permit compounding in the present situation.

■■■ Plaintiff's second point really needs no response. The additional amounts awarded under § 537.520 are in fact damages, not interest as such, see *Commercial Credit Corp. v. Joplin Auto Auction Co.*, *supra*, and are simply a part of the total damage award in the case. All of that damage award will, of course, bear post-judgment interest.

## IV.

## THE CITY'S MOTION TO AMEND THE JUDGMENT

The City, in essence, asks me to declare that upon its payment of the judgment herein it will become the "complete and exclusive owner" of (a), the actual physical items which were converted, and (b), all copies thereof which plaintiff retains. Al-though any real effort by the parties to develop the issues bearing on these points might conceivably have led to a different result, I conclude, upon the record as it stands, that request (a) must be granted, while request (b) must be denied.

■■■ There can be no doubt that upon payment of the judgment the City would, in a general sense, become the "owner"—so far as plaintiff is concerned—of the specific, physical items which were converted: those items the City refused to return to plaintiff upon plaintiff's demand. See *Third National Bank v. Rice*, 161 F. 822, 826–27 (8th Cir.1908); *St. Louis Fixture & Show Case Co. v. F.W. Woolworth Co.*, *supra*; 1 *Harper and James*, *supra* § 2.12.[11] I note, however, that under both the Federal Copyright Act, 17 U.S.C. §§ 101 et seq., and under the doctrine of "common law copyright" (to the extent it has any continued bearing here, in view of the extensive preemption of the area accomplished by the 1976 amendments to the Copyright Act), ownership of a copyright is something distinct from ownership of a physical object in which the copywritten work is embodied, so that ownership of one can (and often will) be transferred without transferring ownership of the other. See 17 U.S.C. § 202; 18 *C.J.S.*, *Copyright and Literary Property*, § 12a (1939). In theory, then, plaintiff's continued ownership of a copyright in the items in question might arguably limit to some degree the City's ability to do with them as it wished, regardless of its ownership of the items. But plaintiff has neither claimed nor proved any such copyright. To the contrary in fact, it has in effect disclaimed any such thing.[12] In these circumstances the only conclusion to be reached is that the City's

11. Defendants have also requested that I determine who, as between the City and defendant Threatt, would become the owner of the items upon payment of the judgment. Neither defendant has favored me with suggestions or thoughts on the matter, however, or even intimated that there is any real dispute between them; and in the circumstances I must decline to expend the court's time in researching the subject for the parties, particularly when my opinion would, of necessity, be advisory only.

12. Edward Gray, plaintiff's president and Board chairman, testified that there was no copyright on the items, and in fact (for whatever his opinion may have been worth) that they were not copyrightable. Since an objection to the latter part of his testimony was sustained, I note that I make reference to it here only by way of demonstrating plaintiff's apparent attitude on the matter.

ownership and use of the converted items will be full and unrestricted so far as plaintiff is concerned.

There is nothing in this, however, which gives the City any right or ownership in other items it did *not* convert and which plaintiff lawfully holds, even though they may be duplicates of the items converted. Such a right, so far as I am aware, could exist only by virtue of a copyright interest in the items converted; and while the City is perhaps not bound by plaintiff's denial that it held such rights, neither has it adduced any proof to the contrary. Certainly, in any event, the evidence available to me does not permit a finding that plaintiff in fact held a copyright interest which would pass to the City by virtue of the judgment herein, even if the judgment could theoretically have that effect. I hold, accordingly, that plaintiff is free to make such use of its copies of the converted items as it might wish.

## V.

### ORDERS

Based upon the foregoing, plaintiff's motion to amend the judgment previously entered shall be and is herewith denied, except to the extent that plaintiff seeks reassurance that the total amount of damages awarded, including additional damages calculated by way of the governing rate of interest from the date of conversion to the date of judgment, shall bear post-judgment interest. Defendants' motion to amend the judgment shall be and is hereby granted in part and denied in part, upon the terms set forth in Section IV. of this opinion. The judgment is otherwise reconfirmed.

IT IS SO ORDERED.